302 S.W.3d 436 (2009)
In the Interest of J.J.C.;
In the Interest of K.J.S.; and
In the Interest of J.J.R.
Nos. 14-08-01074-CV, 14-08-01091-CV, 14-08-01129-CV.
Court of Appeals of Texas, Houston (14th Dist.).
November 17, 2009.
Rehearing Overruled January 28, 2010.
*439 Marc D. Isenberg, William B. Connolly, Houston, TX, for appellants.
Sandra Hachem, Houston, TX, for appellees.
Panel consists of Justices ANDERSON and BOYCE.

OPINION
WILLIAM J. BOYCE, Justice.
The mother of three children and the father of one of the children appeal the termination of their respective parental rights. Because we conclude that the trial court did not err in determining that termination of parental rights is in each child's best interest, and the parents' remaining challenges are waived, we affirm.

I. FACTUAL AND PROCEDURAL HISTORY
The events that led to the termination of appellants' parental rights did not begin with the State's most recent investigation; this was the third time that the Department of Family and Protective Services ("DFPS" or "the Department") had been called upon to investigate allegations of neglect or abuse of these children, and the second time they were removed from their home. Because all of the investigations are relevant to the issues we address, we include in our discussion the evidence introduced at trial of all three incidents. To protect the children's privacy, we refer to eight-year-old J.J.C. (a/k/a J.J.H. a/k/a J.J.M.) as "Jack," seven-year-old J.J.R. as "Jill," and six-year-old K.J.S. as "Kevin";[1] we refer to the children's mother only as "Mother" and to Kevin's father as "Father." The respective fathers of Jack and Jill have not appealed the termination of their parental rights.

*440 A. 2001 Investigation
In late summer or early autumn 2001, it was alleged that Father picked up Mother and Kevin from a hospital where Mother had taken the infant[2] for treatment of cold symptoms. Once they were in the car, Father allegedly hit Mother repeatedly in the face and the side of her head. Mother sustained no visible injuries, and the Department was unable to determine that the children were neglected or abused.

B. 2002 Investigation
On August 20, 2002, the Department received a referral regarding neglectful supervision and physical abuse of all three children by Mother and Father. According to the Department employee who interviewed Mother,
[Mother stated that Father] jumped on her and pushed her head down into the sofa and she was unable to breathe. She stated that she fought with [Father] and was finally able to get him off of her. She stated then she hit [Father] with her fist. She stated that [Father] then threw two large boxes of clothing at her. She stated that her one-year-old son [Kevin] was playing on a plastic slide about two feet from the ground and [Father] knocked [Kevin] off the slide and she caught [Kevin] before he fell onto the floor. [Mother] stated then [Father] stabbed her in the shoulder with a screwdriver. She stated then she ran to the kitchen for a knife to cut [Father's] car tires. She denied that [Father] threatened her with a gun; [but] she stated that once [Father] showed her his gun, she threw the knife down.
Jack, who was three years old at the time, corroborated these allegations:
[Jack] stated that his daddy choked his mother's neck and put a gun to her eye and daddy told his mommy that he was going to kill her. He stated that he told his daddy to get off his mommy and then his daddy stopped. He stated that his mother had a big knife and she tried to cut his daddy's tires on the car.
At the time of the 2002 interview, all of the children were free of marks or bruises and appeared to be well-cared for and developmentally on target. The Department determined there was reason to believe that Father abused Kevin, but was unable to determine that Jack and Jill were abused. All three children were removed from Mother's home for less than two weeks, and although the Department initially sought termination of the parents' rights to the children, the case was nonsuited.
In the time between the first and second investigations, Father was convicted of criminal mischief in an incident that, according to Father, concerned a domestic disturbance with Mother. Between the second and third investigations, Father was convicted of possession of marijuana.

C. 2007 Investigation
On Friday, April 27, 2007, Child Protective Services ("CPS") was alerted that Jack, Jill, and Kevinthen aged eight, seven, and sixwere without adequate adult supervision. According to Mother, she had been involved in a dispute with another woman and believed that the conflict made it unsafe for the children to walk home alone from the school bus stop nearest to their apartment. She therefore had arranged for the children to ride the school bus to their maternal grandmother's house, but on this day, the children's grandmother wanted to go to a club and refused to let the children in. Kevin's *441 father lived nearby,[3] so the children went to his apartment, crossing a major intersection to do so. Kevin's father was not home, so the children began walking to their own home, which was ten or twelve blocks away on a major street in a high-crime area. They were intercepted by one of Mother's friends who lived nearby. While they were speaking with the neighbor, Kevin's father saw the children. Local police were called, and Jack and Jill were taken into emergency custody; Kevin was left with his father.
At 9:30 p.m., Mother contacted authorities to report the children missing. It is reported that her voice was slurred, and she was suspected of being under the influence of an intoxicating substance. At approximately 11:30 p.m., she went to Father's apartment and demanded that he return Kevin. He refused, and according to Father and witnesses, Mother threatened Father with a knife. Police were called, and Mother was charged with aggravated assault with a deadly weapon.
Mother was allowed to retrieve the children the next day, and on May 1, 2007, she was interviewed by a Department caseworker. Mother denied that she used drugs, but stated that someone might have put something in her drink. She submitted to urinalysis testing on May 2, 2007, and tested positive for cocaine, marijuana, and benzoids. On May 4, 2007, a caseworker visited the home where the children resided with Mother, and found trash on the floor, dishes in the sink, and the home so cluttered it was difficult to walk through it. The children were taken into custody, and after they were removed from their home, all three children reported sexual abuse by male members of Mother's family.
Mother initially was incarcerated on the assault charges, but she eventually accepted deferred adjudication, and on November 27, 2007, she entered a halfway house for drug rehabilitation. While there, she wrote letters to the children, remained in telephone contact with the children's caseworker, and was allowed some visitation. Although she had not completed her assigned classes and programs, Mother left the facility on May 19, 2008, asserting that she had been sexually assaulted by the facility's director. On July 16, 2008, Mother was incarcerated for violating the terms of her community supervision; she was still incarcerated at the time of trial. She had no visitation with the children during either period of incarceration.
During this time, Father completed a parenting class and was allowed two visits with Kevin in August 2007; however, future visits were discontinued due to their negative effect on Kevin's behavior.

D. Trial
After a bench trial in October 2008, Father's parental rights to Kevin and Mother's rights to all three children were terminated, and the Department was appointed as the children's sole managing conservator. The trial court found that each parent constructively abandoned the children and failed to comply with a court-ordered family service plan, and that termination was in the children's best interests. See TEX. FAM.CODE ANN. §§ 161.001(1)(N) (addressing constructive abandonment as a ground for termination); 161.001(1)(O) (addressing failure to comply with court-ordered service plan as a ground for termination); 161.001(2) (addressing requirement that termination be in the child's best interest) (Vernon 2009). In addition, the trial court found that Mother failed to complete a court-ordered substance abuse *442 treatment plan. See id. § 161.001(1)(P). The day after the judgment was signed, Father filed a motion for new trial and a separate statement of points on appeal;[4] Mother timely filed a combined new-trial motion and statement of appellate points. See id. §§ 263.405(b), (b-1). Both parents also filed indigency affidavits.
As required by law, the trial court held a hearing to determine if a new trial should be granted, the indigency claims should be sustained, and if the proposed appeals were frivolous. See id. § 263.405(d). At the hearing, counsel for each parent argued that there was legally and factually sufficient evidence to support the trial court's findings under section 161.001(1). Neither Father's counsel nor Mother's counsel mentioned the trial court's finding that termination of their parental rights was in the children's best interest. The Department responded as follows:
[T]he Court heard all of the evidence. The evidence was overwhelming and voluminous with regards to each one of these issues and by clear and convincing evidence I believe the Court ruled correctly and I'd ask the Court to overrule the Motion for New Trial. With regards to the Points on Appeal, I'd ask the Court to find that this is a frivolous appeal....[5]
The trial court denied the motions for new trial, sustained the claims of indigency, and found each parent's proposed appeal frivolous.

II. ISSUES PRESENTED
Mother and Father each present three issues in which they challenge the legal and factual sufficiency of the evidence supporting the trial court's findings that (a) each parent constructively abandoned his or her child or children, (b) each parent failed to comply with the provisions of a court-ordered family service plan, and (c) termination of parental rights is in each child's best interest. Mother presents one additional issue in which she challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that she failed to complete a court-ordered substance-abuse treatment plan. In two additional issues, Father challenges the trial court's finding that his appeal is frivolous, and asks that if we reverse the termination of his parental rights, we also reverse the trial court's appointment of DFPS as Kevin's sole managing conservator.
Because a party appealing a judgment in which a finding of frivolousness was issued is initially limited to a review of that finding, we may not consider the substantive merits of their legal and factual sufficiency challenges unless we first conclude that the frivolousness finding must be reversed. In re K.D., 202 S.W.3d 860, 865 (Tex.App.-Fort Worth 2006, no pet.) (op. on reh'g). We therefore construe a parent's appeal to encompass a challenge to the frivolousness finding even when the parent does not specifically assign error to that finding. See Lumpkin v. Dep't of Family & Protective Servs., 260 *443 S.W.3d 524, 525 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (citing TEX. FAM.CODE ANN. § 263.405(g)); In re R.C.R., No. 14-08-00904-CV, 2009 WL 997514, at *2 (Tex. App.-Houston [14th Dist.] Apr. 14, 2009, no pet.) (mem. op.); In re R.A.P., No. 14-06-00109-CV, 2007 WL 174376, at *5 (Tex. App.-Houston [14th Dist.] Jan. 25, 2007, no pet.) (mem. op.). Accordingly, we construe Mother's briefing to include a challenge to the trial court's finding that her appeal is frivolous.

III. PREREQUISITES FOR APPELLATE REVIEW
Most of the issues presented in this appeal turn on the application of Texas Family Code section 263.405, which provides in pertinent part as follows:
(b) Not later than the 15th day after the date a final order is signed by the trial judge, a party who intends to request a new trial or appeal the order must file with the trial court:
(1) a request for a new trial; or
(2) if an appeal is sought, a statement of the point or points on which the party intends to appeal.
(d) The trial court shall hold a hearing not later than the 30th day after the date the final order is signed to determine whether:
(1) a new trial should be granted;
(2) a party's claim of indigence, if any, should be sustained; and
(3) the appeal is frivolous as provided by Section 13.003(b), Civil Practice and Remedies Code.
. . .
(i) The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial. For purposes of this subsection, a claim that a judicial decision is contrary to the evidence or that the evidence is factually or legally insufficient is not sufficiently specific to preserve an issue for appeal.
TEX. FAM.CODE ANN. § 263.405.
Although section 263.405(i) does not prevent an appellate court from considering certain constitutional complaints that were not included in a statement of points on appeal,[6] the parties do not raise such arguments here. We therefore are limited to reviewing those issues that were "specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial." Id. § 263.405(i). Thus, as a threshold matter, we identify the issues preserved by the parents' respective statements of points on appeal and determine whether the trial court abused its discretion in finding that an appeal on such grounds would be frivolous.

IV. SUFFICIENCY OF STATEMENTS OF POINTS ON APPEAL
Although Mother's statement of points on appeal was combined with her motion for new trial and Father filed his separately, the points listed are nearly identical. Each contends that the trial court erred in entering its judgment terminating his or her parental rights, because there was (a) "no evidence to support the [trial court's] ruling," (b) "factually insufficient evidence to support the [trial court's] ruling on both grounds for termination and on best interest," and (c) "legally insufficient evidence *444 to support the [trial court's] ruling on both grounds for termination and on best interest."
To satisfy the requirements of section 263.405(i), a statement of points must be "sufficiently specific" to allow the trial court to correct any erroneous findings on the challenged grounds. Adams v. Tex. Dep't of Family & Protective Servs., 236 S.W.3d 271, 278 (Tex.App.-Houston [1st Dist.] 2007, no pet.). "`The plain language of the statute indicates the Legislature intended to bar our consideration of global, nonspecific claims of evidentiary insufficiency in a Statement of Points.'" In re S.K.A., 236 S.W.3d 875, 899 (Tex.App.-Texarkana 2007), pet. denied, 260 S.W.3d 463 (Tex.2008) (per curiam) (quoting In re N.L.G., No. 06-06-00066-CV, 2006 WL 3626956, at *3 (Tex.App.-Texarkana Dec. 14, 2006, pet. denied) (mem. op.)). Here, each parent's statement lacks the specificity required to preserve the appellants' arguments that the evidence was legally and factually insufficient to support the trial court's findings that either appellant violated Texas Family Code section 161.001(1)(N), (O), or (P). Compare In re G.W.P., No. 14-08-00035-CV, 2009 WL 2568292, at *2 (Tex.App.-Houston [14th Dist.] Aug. 20, 2009, no pet. h.) (mem. op.) (statements challenging the legal and factual sufficiency of the evidence to support the trial court's "ruling" lacked the specificity required to preserve such challenges for review), with In re J.J.W., No. 06-09-00030-CV, 2009 WL 2432634, at *2 n. 2 (Tex.App.-Texarkana Aug. 11, 2009, no pet. h.) (mem.op.) (statement challenging each of six grounds alleged against parent was sufficiently specific to preserve issues for review), and In re D.J.E., Nos. 13-08-00349-CV and 13-08-00350-CV, 2008 WL 5196608, *2 (Tex.App.-Corpus Christi Dec. 11, 2008, no pet.) (mem.op.) (appellant preserved issues for review by separately challenging each ground for termination). Because section 263.405(i) bars our consideration of the merits of these issues, the trial court's finding that these points are frivolous is both correct and immaterial.
On the other hand, each parent's statement was sufficiently specific to preserve appellants' challenges to the legal and factual sufficiency of the evidence supporting the trial court's "best interest" findings. See In re S.K.A., 236 S.W.3d at 899 (separate complaints as to each of the separate grounds of termination and the best-interest finding satisfy the specificity requirement). Thus, if the trial court erred in determining that the parents' proposed appeals of the best-interest findings were frivolous, then we may evaluate the merits of that argument.

V. FRIVOLOUSNESS

A. Standard of Review
Family Code Section 263.405(d)(3) directs the trial court to determine whether an appeal from a termination order is frivolous "as provided by section 13.003(b), Civil Practice and Remedies Code." TEX. FAM.CODE ANN. § 263.405(d)(3). Section 13.003(b) provides that, "[i]n determining whether an appeal is frivolous, a judge may consider whether the appellant has presented a substantial question for appellate review." TEX. CIV. PRAC. & REM.CODE ANN. § 13.003(b) (Vernon 2002). An appeal is frivolous if it lacks an arguable basis either in law or in fact. See Lumpkin, 260 S.W.3d at 525.
Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(1), (2); In re J.O.A., 283 S.W.3d 336, 344 (Tex.2009). Clear and convincing evidence is "proof *445 that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007; In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002).
In conducting a legal-sufficiency review in a parental termination case, a reviewing court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. In re J.P.B., 180 S.W.3d 570, 573-74 (Tex.2005). In reviewing termination findings for factual sufficiency, courts must give due deference to the factfinder's resolution of factual questions. In re C.H., 89 S.W.3d 17, 27 (Tex.2002). The court then determines whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parents. Id. at 25. When the trial court conducts a frivolousness hearing on a parent's proposed appeal on legal and factual sufficiency grounds, the trial court should apply the standard of review applicable to clear and convincing evidence as set out above. In re K.D., 202 S.W.3d 860, 867-68 (Tex.App.-Fort Worth 2006, no pet.). We then evaluate the trial court's frivolousness finding under an abuse-of-discretion standard. Lumpkin, 260 S.W.3d at 526; In re M.N.V., 216 S.W.3d 833, 834 (Tex.App.-San Antonio 2006, no pet.).

B. Scope of Review
There is a split of authority concerning an appellate court's scope of review when evaluating a frivolousness finding in a case concerning the termination of parental rights.
One court has held that the appellate court must review all of the evidence admitted at trial if a party raises a legal or factual sufficiency challenge that the trial court finds to be frivolous. See In re S.T., 242 S.W.3d 923, 925 (Tex.App.-Waco 2008, no pet.) ("[W]e hold as a matter of due process that, because [father] has raised legal and factual sufficiency claims, the court reporter shall file a transcription of `all of the evidence admitted' at trial at no cost to the appellant.").
Other courts have held it appropriate to consider the entire record only if the reviewing court is unable to determine from the record of the frivolousness hearing alone whether the trial court abused its discretion in finding the appeal frivolous. See, e.g., In re T.C., 299 S.W.3d 828 (Tex. App.-San Antonio 2009, no pet. h.); In re M.R.J.M., 193 S.W.3d 670, 674-75 (Tex. App.-Fort Worth 2006, order) (en banc).
A different court has held that where a parent challenged the sufficiency of the evidence supporting the trial court's best-interest finding and the evidence was neither presented at the frivolousness hearing nor "apparent" from the termination order, the appropriate course was not simply to review the entire record when evaluating frivolousness; instead, the correct procedure was to reverse the frivolousness finding and address the challenge on the merits. See In re A.B., 269 S.W.3d 120, 125 (Tex.App.-El Paso 2008, no pet.).
Still another court has held that a reviewing court is not required to review the reporter's record of the trial if, from the hearing transcript, it can "discern" the allegations against the parents and the evidence on which the parties rely. See In re A.S., 239 S.W.3d 390, 392-93 (Tex.App.-Beaumont 2007, no pet.) (due process did not require review of the reporter's record of the trial in order to evaluate the frivolousness finding; "From the record of the hearing on the statement of points, we can discern both the State's allegations and evidence supporting the grounds for termination *446 and the evidence supporting [the father's] arguments on his appellate issues.").
Father implicitly assumes that our review of the frivolousness finding is limited to the hearing record. He contends that the Department "has the burden of proof on the issue of frivolousness and presented no evidence in this regard, effectively waiving this issue." We disagree not only with his premise, but also with this characterization and the inference Father has drawn from it.[7]
The hearing transcript demonstrates that the Department expressly relied on the trial evidence, and although it is true that the Department did not repeat the previously offered evidence at the hearing, it was not required to do so. The same judge conducted the trial and the frivolousness hearing; thus, the trial court is presumed to "judicially know[ ] what has previously taken place in the case" tried before it, and the parties "are not required to prove facts that a trial court judicially knows." Vahlsing, Inc. v. Mo. Pac. R.R. Co., 563 S.W.2d 669, 674 (Tex.App.-Corpus Christi 1978, no writ).
Moreover, the hearing record establishes that the trial court did not limit its consideration to matters presented at the hearing; like the Department, the trial court also considered the proceedings at trial. This is demonstrated by the following exchange, which took place after the trial court heard argument regarding Mother's combined motion for new trial and statement of points on appeal:
Court: All right. Can you just stand[ ] by a minute? I want to get my notes from the trial. I'll be right back.
(Recess taken)
Court: [Mother's Attorney], can I see your points again a second so I can look at them in the context of my notes?
All right. Anything further?
. . .
State: The same response on the Points on Appeal, Judge. We would ask the Court to deny the Points on Appeal and also find that this appeal is frivolous based upon the totality of the evidence that the Court heard with regards to all of the Points on Appeal.
. . .
Court: Well, as to [Mother's] Motion for New Trial, the Court is denying her Motion for New Trial; and as to her Points on Appeal, the Court after reviewing its notes and hearing the argument of counsel also finds that appeal is frivolous.
(emphasis added).
Finally, Father's waiver argument is unpersuasive in that the trial court is required by statute to determine whether such proposed appeals are frivolous, regardless of whether the Department requests such a finding or presents any argument or evidence. See TEX. FAM.CODE ANN. § 263.405(d)(3); see also In re T.A.C.W., 143 S.W.3d 249, 250 (Tex.App.-San Antonio 2004, no pet.) (remanding case for trial court's determination of whether appeal is frivolous). Thus, the Department did not waive this issue as Father contends. See In re M.G.D., 108 S.W.3d 508, 516 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (section 263.405's purpose is to reduce post-judgment appellate *447 delays); cf. Mo. Pac. R.R. Co. v. Am. Statesman, 552 S.W.2d 99, 105-06 (Tex. 1977) (waiver "cannot be invoked to nullify a mandatory statutory restriction, especially when such restriction is enacted for the benefit of the general public as opposed to those benefits that inure to a private individual"); Sartin v. Hudson, 143 S.W.2d 817, 823 ("A right or privilege given by statute may be waived or surrendered, in whole or in part, by the party to whom or for whose benefit it is given.").
On these facts, the clerk's record and reporter's record of the frivolousness hearing are insufficient to allow us to determine from the hearing record alone whether the trial court acted within its discretion. See In re T.C., 299 S.W.3d 828. Because the hearing transcript establishes that the Department relied "on the totality of the evidence" presented at trial and the trial court likewise considered the trial proceedings in evaluating the frivolousness of the proposed appeals, our review of the material on which the trial court based its finding necessarily includes evidence from the trial.

C. Mother's Appeal
The determination of a child's best interest does not require proof of any unique set of factors, nor does it limit proof to any specific factors. See Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). In reviewing the sufficiency of the evidence to support a best-interest finding, courts consider, inter alia,
(1) the child's age and physical and mental vulnerabilities;
(2) the frequency and nature of out-of-home placements;
(3) the magnitude, frequency, and circumstances of the harm to the child;
(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;
(5) whether the child is fearful of living in or returning to the child's home;
(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;
(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;
(9) whether the perpetrator of the harm to the child is identified;
(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;
(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;
(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:
(A) minimally adequate health and nutritional care;
(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
(C) guidance and supervision consistent with the child's safety;
(D) a safe physical home environment;
(E) protection from repeated exposure to violence even though the *448 violence may not be directed at the child; and
(F) an understanding of the child's needs and capabilities; and
(13) whether an adequate social support system consisting of an extended family and friends is available to the child.
TEX. FAM.CODE ANN. § 263.307(b). Courts also may consider (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody in promoting the best interest of the child, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. Holley, 544 S.W.2d at 371-72.
As previously discussed, an appeal is frivolous if it lacks an arguable basis in fact or law. Here, however, Mother presented no argument to the trial court concerning her stated intent to challenge the sufficiency of the evidence supporting the trial court's best-interest findings. At the frivolousness hearing, her attorney never mentioned her children's best interests, the trial court's best-interest findings, or her proposed appeal of these findings. On appeal, Mother cites testimony by two witnesses and argues only that "[t]he entire Reporter's Record is barren of meaningful questions and answers as it relates to the non-exhaustive list as announced in [Holley] or as codified in [section] 263.307 of the Texas Family Code." (emphasis added).
The reporter's record, however, contains abundant evidence relevant to the determination of the children's best interests, although the evidence is not necessarily in "question-and-answer" form. It includes criminal, medical, and agency records; notes from interviews of relatives, neighbors, teachers, and foster parents; and voluminous records from the children's therapists. When the totality of the evidence is considered, the evidence relevant to the children's best interests includes the following:
 This is the third investigation by the Department of Family and Protective Services of possible abuse or neglect of these children, and the second time they have been removed from Mother's possession.
 In a "Call Narrative," it is noted that "the children in the home had minimal adult supervision and the environment was highly sexualized." These conclusions are amply supported by the record.
 Jill disclosed in therapy sessions that her brothers and cousins "sexually acted out together because they had viewed a sex movie that belonged to their mom and her boyfriend. [Jill] also reports that her mom had sex with her boyfriend in front of the children. And, one time her mom's boyfriend raped her mom, while [Jill] was watching." In foster care, seven-year-old Jill was repeatedly redirected from dancing in an inappropriate and sexual manner. According to Jill, her mother taught her to dance that way. For a year after entering foster care, Jill had nightmares with sexual content several times each week; in particular, she dreamed about inter-family rape.
 Jack reported to his therapist that "[w]hen living with his mother she *449 often had wild parties" and an adolescent male sexually assaulted him in his own home.
 Jack demonstrated how the offender had sex with him, and while at school, Jack "constantly sp[oke] of being raped." Jack and Jill each identified the offender as "Wink," Mother's nephew or cousin. Nevertheless, when asked at trial if Wink had sexually assaulted Jack on several occasions while in her possession, Mother answered, "No."
 Kevin also reported that "a raper" touched his penis, and identified the offender as a fifteen-year-old male known as "Baby Boy."
 According to a caseworker, Jack reported that "his mother often would burn him when she became angry, and it appeared that he was the scapegoat of the family." Jack reportedly told caseworkers or foster family members that Mother would burn him when she was angry at her boyfriend. He pointed out a scar on his leg from such an incident.
 Although Jack stated that he wanted to live with his mother, it was repeatedly noted that Jack became angry and aggressive when told he would be visiting her.
 During visits, Mother singled out Kevin for "constant praise" of his physical appearance. The other two children did not receive similar attention. Around the same time, Kevin was suspended from school for three days "because of his obsession with kissing the girls, gestures, references to and making recommendations of acts to his private parts and his constant use [of] profane language." His sexual behavior was not directed solely to his peers: Kevin also touched his female teachers in-appropriately and exposed himself in his foster homes.
 The children's behavior deteriorated after visiting their mother.
 Jill is in a stable placement with a family that hopes to adopt her. She has been learning to behave in a more age-appropriate manner.
 As a result of their more serious problems with aggression and sexual acting-out, Jack and Kevin have been in multiple foster homes. Jack has been diagnosed with mood swing disorder, attention-deficit hyperactivity disorder, post-traumatic stress disorder, and mild mental retardation. Kevin has been diagnosed with post-traumatic stress disorder and suffers from hallucinations and severe sleep disturbances, often sleeping only three or four hours per night. Jack was placed in a psychiatric hospital once, and Kevin has been hospitalized twice. Both have problems with bedwetting, nightmares, aggression, repeated profanity and sexual references, and touching or shoving female peers in sexual ways. Both are receiving therapy to help them cope with their sexual abuse.
 At the time of trial, Mother had not contacted the children's caseworker in three months.
 Mother has bipolar disorder, severe depression, and a history of drug abuse. She is mentally retarded, as is her mother, grandmother, and four of her eight siblings. She has had repeated contact with sexual offenders and lacks effective support from family members for successful parenting. Jack's father, for example, was convicted of sexual assault of a child, and the people identified as having sexually assaulted her sons are members of her family. Although *450 she spent years in Child Protective Services' custody as a child due to neglect by her own mother and sexual abuse by family members, she nevertheless entrusted her own children to her mother's care.
 Between April 27, 2007 and October 2008, Mother committed aggravated assault with a deadly weapon; was incarcerated for six months before entering an agreement for deferred adjudication and moving to a halfway house; attempted suicide; left the halfway house where she was undergoing drug treatment; violated the terms of her probation; and was incarcerated again. She blames others for each of these events.
We conclude that the trial court did not abuse its discretion in finding that Mother's challenge to the legal and factual sufficiency of the evidence supporting the best-interest finding does not present a substantial question for appellate review. We therefore affirm the trial court's finding that Mother's appeal is frivolous and do not reach the merits of her appeal.

D. Father's Appeal
Like Mother's trial attorney, Father's counsel presented no argument at the frivolousness hearing concerning Father's challenge to the trial court's finding that termination of his parental rights is in Kevin's best interest, and the Department continued to refer the court to the evidence presented at trial. On appeal, Father, like Mother, directs his arguments primarily to trial testimony while overlooking much of the evidence presented through trial exhibits. For example, he states that "[t]here is no mention in the entire record of any act or omission on [Father's] part that caused his child to come into DFPS care." He further asserts there is no evidence that he "ever posed a risk" to Kevin; no competent evidence regarding his ability to maintain a stable environment;[8] and no direct evidence of Kevin's desires.
The record does not support Father's contentions because it includes evidence of the following:
 Both prior reports to the Department concerned Father's violent behavior. Both prior incidents took place in Kevin's presence; in one of them, Kevin was one of the victims. That incident prompted Child Protective Services to remove the children from the home in 2002. The Department ruled out physical abuse of Jack and Jill, but concluded there was moderate reason to believe Father had physically abused Kevin. Kevin was one year old at the time.
 Father has been diagnosed with paranoid schizophrenia and has auditory hallucinations. Although the hallucinations are controlled with medication, he does not always choose to take his medication as directed.
 At one point during the pendency of this case, Father represented to the Department that he lived with his parents. During a home visit, however, it was observed that Father knocked on the front door when he arrived at the apartment, and an investigator *451 testified that she did not believe Father was actually living there. During that visit, Father's mother appeared fearful of him and told investigators that when Father is angry, he is "very out of control."
 Father's testimony was markedly confused. He testified that the incident in which Mother failed to pick the children up from school did not occur on April 27, 2007, but "days before then," and that Kevin had been left in his care between one and two-and-one-half weeks before this incident. He agreed, however, that the day Mother threatened him with a knife was the same day that the children were not picked up from the bus stop. He testified that Kevin told him that he, Kevin, had been sexually assaulted by one of Mother's boyfriends, and claimed that when Kevin said this, Father called the police and Child Protective Services. According to Father, all of these conversations occurred on the day that the children were not met at the school bus stop. But Father then testified that before Kevin was removed from his mother's possession, Father did not know that Kevin had been molested. And when the trial court asked, "He [Kevin] never told you directly anything?" Father answered, "No, ma'am." Aside from Father's contradictory testimony, there is no evidence in the record that Father reported Kevin's sexual abuse to anyone at any time.
 Father completed a parenting class and his therapist noted his commitment in keeping therapy appointments in order to obtain permission to visit Kevin. Nevertheless, after his two visits with Kevin in August 2007, the Department stopped further visits because Kevin's bedwetting and "acting out" increased and he began soiling himself.
 No evidence was found in the record that Kevin has ever expressed a desire to live with Father or stated that he missed him; to the contrary, Kevin stated that he wanted to live with his mother or his foster mother.
 At the time of trial, Father was living with and engaged to a woman who was convicted of aggravated assault, and the lease is in her name. Father does not believe his girlfriend's conviction is important because the victim was an adult.
 Father purportedly told a psychiatrist that he attempted suicide while this case has been pending.
 Father has not worked since April 2, 2007, but he has been receiving disability payments since February 2008. He told the caseworker that he spends about $20 a day eating out, which is considerably more than he receives. It therefore does not appear that he contributes financially to the support of a second child, conceived and born while Kevin has been in foster care.
On this record, there is no arguable basis, in fact or in law, for challenging the sufficiency of the evidence to support the trial court's finding that termination of Father's parental rights is in Kevin's best interest. We therefore conclude that the trial court did not abuse its discretion in finding Father's appeal of the best-interest finding frivolous.

VI. CONCLUSION
We hold that the trial court did not abuse its discretion in concluding that each parent's appeal of the best-interest findings is frivolous. Because Mother and Father failed to present their remaining evidentiary-sufficiency *452 challenges with the specificity required to preserve them for review, the trial court acted within its discretion in finding those issues frivolous as well. We therefore affirm the trial court's judgment.
Former Justice GUZMAN not participating.
NOTES
[1] See TEX.R.APP. P. 9.8 (requiring alias name for child in parental-rights termination cases).
[2] The record contains conflicting evidence regarding the date of this incident; Kevin was between three months and five-and-one-half months old at this time.
[3] Mother and Father had not married and had always maintained separate residences.
[4] Because Father's statement of points on appeal initially was not included in the record, he urged us to construe his motion for new trial to encompass the required statement; however, in response to an order from this court, the clerk of the trial court produced Father's statement of appellate points in a supplement which we received after oral argument.
[5] Although this excerpt is taken from the State's response to Mother's combined motion for new trial and statement of points on appeal, the State's response to Father's arguments is virtually identical.
[6] See In re J.O.A., 283 S.W.3d 336, 339 (Tex. 2009); In re D.W., 249 S.W.3d 625, 632 (Tex. App.-Fort Worth 2008), pet. denied, 260 S.W.3d 462 (Tex.2008) (per curiam).
[7] We further note that this argument is inconsistent with Father's action in filing a written request that a transcript of the trial proceedings and copies of all trial exhibits be included in the appellate record. See TEX. FAM.CODE ANN. § 263.405(g).
[8] Father's testimony establishes that he moved at least three times in the seventeen months between Kevin's removal and trial; during that time, Kevin was placed successively in four foster homes. Thus, the evidence is such that a reasonable fact finder could firmly believe that neither Father nor the Department has been able to provide Kevin with a stable home. See In re C.T.E., 95 S.W.3d 462, 468 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (noting that the Department did not provide a stable home environment to a child placed in six foster homes over a five-year period).