**Affirmed and Memorandum Opinion filed February 28, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00652-CV

---

### IN THE INTEREST OF J.J., A CHILD

---

### On Appeal from the 315th District Court
### Harris County, Texas
### Trial Court Cause No. 2009-05798J

---

## M E M O R A N D U M   O P I N I O N

In this appeal from the termination of his parental rights, Jason M. asserts that the trial court abused its discretion in finding his appeal to be frivolous. He further contends that the evidence is legally and factually sufficient to support the trial court's judgment terminating his parental rights. We affirm.

### BACKGROUND

J.J. was born on May 28, 2007. In June 2009, the Texas Department of Family & Protective Services ("DFPS") received a neglectful supervision report regarding J.J. DFPS worker Debra Wilkinson made contact with J.J.'s mother, Janell J. Wilkinson interviewed Janell, who voluntarily provided a swab drug test. At the visit, J.J. was clean and appeared to be well cared-for; Janell's home was clean, had food, and appropriate

toys for J.J. In July 2009, the DFPS received a positive result from Janell's drug test. Wilkinson contacted Janell, who explained the test results by claiming that she had taken diet pills and Sudafed to relieve congestion.

In early August, the DFPS received another report alleging physical neglect and neglectful supervision of J.J. The caller believed that Janell was using drugs and that J.J. was eating cat food and cat feces and was throwing up. Wilkinson informed Janell that she needed to take J.J. into custody because of the positive drug test and the reports of neglectful supervision. Janell voluntarily placed J.J. with a friend, but later threatened her friend's life if she did not return J.J. to her. The friend contacted the DFPS, and J.J. was taken into DFPS custody and placed in a foster home. On August 10, 2009, the DFPS filed a termination suit, seeking to terminate the parental rights of J.J.'s mother and his alleged father, Jason.

Jason was unaware of his alleged parental status until he was served with citation in the termination suit in June 2010. At that time, he was incarcerated.[1] Jason answered the suit pro se on June 25, 2010, denying paternity and requesting that he retain his parental rights should he be found to be J.J.'s father. The record reflects that, subsequent to the DFPS's filing its termination petition,[2] Jason was convicted of the following offenses and sentenced to the following terms:

---

[1] DFPS personnel had difficulty locating Jason because of his frequent jail status.

[2] Jason had several convictions prior to J.J.'s birth and admitted during the termination proceeding that he had served jail time in South Dakota for forgery before moving to the Houston/Galveston area. The record contains the following earlier Harris County convictions and sentences:

- Misdemeanor Violation of Protective Order, Family Violence, Sentenced to 75 days in Harris County Jail on October 5, 2006;

- Misdemeanor Failure to Identify to a Peace Officer, Sentenced to 75 days in Harris County Jail on October 5, 2006 (concurrent with protective order conviction of same date);

- State Jail Felony Possession of Methamphetamine Less than 1 Gram, Sentenced to 180 days in State Jail on June 13, 2008; and

- State Jail Felony Possession of Controlled Substance Less than 1 Gram, Sentenced to 120 days in Harris County Jail on March 2, 2009.

2

- State Jail Felony Possession of Methamphetamine Less than 1 Gram, Sentenced to 180 days in State Jail on September 3, 2009;

- State Jail Felony Attempted Assault of a Family Member – 2nd Offender, Sentenced to 180 days in State Jail on September 3, 2009 (concurrent with methamphetamine possession conviction of same date);

- State Jail Felony Theft under $1500 – 3rd Offender, Sentenced to 6 months in State Jail on July 14, 2010;

- State Jail Felony Possession of Methamphetamine Less Than 1 Gram, Sentenced to 6 months in State Jail on July 14, 2010 (concurrent with theft conviction of same date);

- Misdemeanor Unlawfully Carrying a Weapon, Sentenced to 30 days in Harris County Jail on November 9, 2010; and

- State Jail Felony Forgery, Sentenced to 2 Years in the Institutional Division of the Texas Department of Criminal Justice On January 6, 2011.

Jason pleaded guilty to each of these offenses.

A two-day bench trial on the termination proceeding began on June 1, 2011, and concluded on July 1, 2011. Jason was present with his appointed counsel each day of trial; Janell was not present but was represented by counsel. On the first day of trial, Jason requested a continuance to allow the DFPS to conduct a home study on a family friend of Jason's, Sylvia Austin. According to Jason's counsel, Ms. Austin was present at court and had recently told Jason's counsel that she and her husband would like to have J.J. placed with them. The trial court denied the motion for continuance, but stated it was "open to the possibility" of a home study of the Austins.

Jason testified that he has two older daughters, with whom he was not close, from previous relationships. Jason could not remember how old his younger daughter was, first testifying that she was eleven, then later testifying that she was eighteen. He stated that the last time he saw his younger daughter was "right before [he] went into prison in South Dakota," where he "did three years . . . for a forgery case. . . . in '97."

Jason explained that, sometime in 2006, he and Janell had a "one night stand" after he discovered that his wife had been having an affair. He testified that he did not learn

that Janell had named him as the possible father of J.J. until September 2010.[3]   He explained that he had met J.J. as a baby when he had stayed with Janell for about two weeks while he was looking for his wife.  He testified that he did not know that J.J. was his son at that time.  He claimed to have taken care of J.J. while at Janell's residence.  According to Jason, he left Janell's residence after she punched him in the face three times when he told her he was going to reunite with his wife.

Jason testified that he met Janell and started selling drugs before J.J. was conceived.  He said that Janell was an escort and he was a driver for the escort company.  According to Jason, Janell introduced him to one of her drug suppliers, and he started selling drugs on the side to make extra money.  Jason stated that Janell used drugs but he did not; he only sold them.  Jason testified regarding his lengthy criminal history and explained that he had been "stuck on stupid" for quite some time, had nothing to live for, and therefore kept reoffending and going back to jail.  Jason admitted that he had been incarcerated for most of J.J.'s life, but stated, "If I had known he was my son, I would've never done it.  I would have been there for him."

He acknowledged that he knew it was possible J.J. was his son in September of 2010[4] and that he committed several offenses after that time.  He blamed the DFPS's "negligence" in establishing his paternity for his continued criminal activity:

> Q.  But the question is you said if you had known you were a father to J.J. you would not have continued to engage in criminal activity?
>
> A.  That's true.
>
> Q.  But after you found out you might be a father that wasn't good enough to make you stop doing criminal acts?
>
> A.  I waited on you-all [DFPS].  You never contacted me, and I didn't know.

---

[3] However, as noted above, the record contains a pro se answer to the termination proceeding filed by Jason in June 2010.

[4] Again, the record reflects that Jason knew he was the alleged father of J.J. in June 2010.

Jason further testified about his forgery conviction, for which he was serving time in the Texas Department of Criminal Justice at the time of the termination proceedings. He stated that his "shore leave" was December 4, 2011, but that he could get parole anytime between "now until then." But based on the two-year sentence imposed in January 2011, Jason's release date for this offense would be January 2013.

Jason also testified that he never received the service plan that DFPS caseworker Andrea Blum sent to him while he was incarcerated, even though the record contains a copy of an acknowledgement sheet with what appears to be his signature. Jason stated that he had not signed the acknowledgement.

DFPS caseworker Blum testified regarding J.J.'s current placement. She explained that when he first came into care, he was developmentally delayed. According to Blum, in his current foster family, J.J. has caught up developmentally and all of his needs are being met. She described his placement as "a very stable, loving home, and he's receiving absolutely everything he could ever need there." Blum testified that the DFPS wanted to terminate Jason's and Janell's parental rights so J.J. could be adopted by his foster family. When asked why she believed that termination of parental rights would be in J.J.'s best interests, she responded, "Neither of the parents have [sic] demonstrated the ability to be able to parent [J.J.]. Neither have [sic] completed the task[s] asked of them. Neither has shown that they can provide a stable living environment to care for [J.J.]." She testified that J.J. was receiving all of those things in his current placement.

Blum stated that she believed Jason had received a copy of the family service plan. She explained that the only completed item was paternity testing. She acknowledged the unlikelihood of Jason's ability to perform many of the assigned tasks while in prison. She further stated that she believed Jason's criminal conduct has (a) endangered J.J.'s physical and emotional well-being, (b) prevented Jason from being able to provide for J.J., and (c) made Jason unavailable emotionally for J.J. Blum stated her belief that Jason's parental rights should be terminated so that J.J. could attain permanency in his foster family by being adopted.

5

On cross-examination, Blum acknowledged that Jason was not served with the termination suit until June 2010, which was approximately ten months after it had been filed, because DFPS workers had been unable to locate him. She stated that she sent him the family service plan in August 2010 and that she was aware that Jason had denied paternity. She testified that the trial court ordered a paternity test in October 2010 and that she mailed a "DNA letter" to Jason in December 2010. According to Blum, Jason had a DNA sample taken in March of 2011 and was adjudicated J.J.'s father on April 25, 2011. She acknowledged that Jason had only known for a little over two months that he was J.J.'s father. She further acknowledged that the DFPS's goal from the beginning of its interaction with J.J. was "unrelated adoption."

Blum additionally testified that Jason never contacted her when he was released from incarceration, never provided her with any names of family members or friends he wanted the DFPS to consider as placements for J.J., and never contacted her to find out whether he really was J.J.'s father. She stated that J.J. is very happy in his current placement, and his foster family, who wants to adopt him, was happy having J.J. in the home. Finally, Blum acknowledged that in other cases in which men are awaiting paternity determinations, they are given service plans and instructed to start services. She agreed that some of these men start their services because they want to show their ability to be a good parent, but acknowledged that some do not. She expressed her belief that men who start services immediately show a strong desire to be a parent. She further agreed that Jason never wrote a letter asking about J.J., his needs, or his date of birth.[5]

On July 15, 2011, the trial court signed a decree terminating Janell's parental rights because it was in J.J.'s best interests and termination was appropriate under subsections (D), (E), (F), (N), and (O) of section 161.001(1) of the Texas Family Code. The trial court further decreed that termination of Jason's parental rights was in J.J.'s best interests and that termination was appropriate under subsections (D), (E), (O), and (Q) of

---

[5] Jason testified on the first day of trial that he did not know J.J.'s date of birth, although the termination suit sent to him included J.J.'s birth date.

section 161.001(1). Janell did not appeal the termination of her parental rights. Jason filed a timely statement of points on which he intended to appeal the trial court's termination decree. Although the trial court found his appeal frivolous, it declared him indigent and ordered a free record and appointed appellate counsel to represent him on appeal. This appeal timely followed.

## ANALYSIS

### A. Frivolousness Finding

In his first issue, Jason asserts that the trail court abused its discretion in determining that his appeal was frivolous.[6] We review a trial court's determination that an appeal is frivolous under an abuse of discretion standard. *Lumpkin v. Dep't of Family & Prot. Servs.*, 260 S.W.3d 524, 526 (Tex. App.—Houston [1st Dist.] 2008, no pet.). An appeal is frivolous when it lacks an arguable basis in law or in fact. *In re J.J.C.*, 302 S.W.3d 436, 444 (Tex. App.—Houston [14th Dist.] 2099, no pet.). In determining whether an appeal is frivolous, the trial judge may consider whether the appellant has presented a substantial question for appellate review. *Id.*

Here, we conclude that the trial court's frivolousness determination was in error. As noted above, the trial court terminated Jason's rights based on subsections (D) and (E), among others, of Texas Family Code section 161.001. These subsections provide that a court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D), (E). Because Jason was unaware

---

[6] Here, the court found Jason's proposed appeal frivolous based on his statement of points detailing his challenges to the termination of his parental rights. *See* Act of May 22, 2001, 77th Leg., ch. 1090, § 9, 2001 Tex. Gen. Laws 2395, 2398 (formerly codified at Tex. Fam. Code Ann. § 263.405(d)). This procedure has since been repealed. *See* Act of May 5, 2011, 82nd Leg., R.S. ch. 75, § 5, 2011 Tex. Sess. Law Serv. 348, 349.

7

that he was J.J.'s father and had no participation in J.J.'s life, he could not have "knowingly" engaged in conduct related to J.J. under subsections (D) or (E). Accordingly, there is no evidence to support the trial court's findings that termination was warranted under these subsections; Jason has therefore presented a substantial question for appellate review. We sustain Jason's first issue. We thus turn to the substantive merits of Jason's appeal.

## B.     Standard of Review

Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In conducting a legal-sufficiency review in a parental termination case, a reviewing court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005). In reviewing termination findings for factual sufficiency, courts must give due deference to the fact-finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The court then determines whether the evidence is such that a fact-finder could have reasonably formed a firm belief or conviction about the truth of the allegations against the parents. *Id.* at 25.

## C.     Termination Under Subsection 161.001(1)(Q)

Jason asserts in issues two through five that the evidence is legally and factually insufficient to support termination under subsections 161.001(1)(D), (E), (O), and (Q).

8

Because only one basis is required to support termination under subsection 161.001,[7] we address Jason's sufficiency challenge regarding termination under (Q). Subsection 161.001(1)(Q) provides that a trial court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "knowingly engaged in criminal conduct that has resulted in the parent's . . . conviction of an offense; and . . . confinement or imprisonment and inability to care for the child for not less than two years from the date of filing of the petition." Tex. Fam. Code Ann. § 161.001(1)(Q). This subsection permits the DPFS to "act in anticipation of a parent's abandonment of the child"; "if the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time the [DFPS] may use subsection Q to ensure that the child will not be neglected." *In re A.V.*, 113 S.W.3d 355, 360–61 (Tex. 2003). As noted above, this termination proceeding was filed on August 10, 2009.

As is relevant here, on January 2, 2011, Jason committed the felony offense of forgery of a commercial instrument. He pleaded guilty to this offense on January 6, 2011 and was sentenced to two years in the Institutional Division of the Texas Department of Criminal Justice. This is the offense for which Jason was incarcerated during the termination proceedings. Viewing this evidence in the light most favorable to the finding, we conclude that the trial court reasonably could have formed a firm conviction or belief that Jason would be unable to care for J.J. due to his two-year sentence for forgery under subsection Q. *In re J.P.B.*, 180 S.W.3d at 573–74.

Jason testified that his "shore leave" for this offense was December 4, 2011. Nothing in our record indicates what Jason meant by "shore leave," but presumably he meant he would be paroled by that date. Evidence of the availability of parole is relevant to determine whether a parent will be released within two years. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006). "Mere introduction of parole-related evidence,

_____

[7] *See, e.g.*, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

however, does not prevent a fact-finder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years." *Id.* at 109. Accordingly, the trial court, as the trier of fact, was entitled to disbelieve Jason, especially in light of Jason's lengthy criminal history. *See id.* Accordingly, the evidence is both legally and factually sufficient to support termination of Jason's parental rights under subsection Q.[8] We overrule Jason's second through fifth issues.

## D. Best Interest of J.J.

In issue six, Jason challenges the sufficiency of the evidence underlying the trial court's best-interest finding. The determination of a child's best interest does not require proof of any unique set of factors, and it does not limit proof to any specific factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). In reviewing the sufficiency of the evidence to support a best-interest finding, courts may consider (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody in promoting the best interest of the child, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72.

Considering the *Holley* factors, the undisputed evidence shows that Jason has been almost completely absent from J.J.'s life. J.J. has been growing up since 2007 with no conscious knowledge of Jason. During the short course of J.J.'s life, Jason has maintained a pattern of committing criminal offenses and serving time in jail. Jason's

---

[8] Even if we consider the date that the termination proceeding was received by Jason—June 2010—rather than the date the proceeding was filed—August 2009—Jason's two-year term of incarceration began after that date in January 2011.

testimony regarding his interaction with his two other children also indicates a pattern of absence in his children's life. He also was imprisoned for several years in another state.

Moreover, Jason was convicted of crimes involving violence against family members. He assaulted his wife and violated a protective order obtained by her. Jason's consistent pattern of criminal behavior both before and after he discovered he could be J.J.'s father, coupled with a history of family violence, supports the trial court's finding that termination of Jason's parental rights would be in the best interest of J.J. *See In re S.M.L.*, 171 S.W.3d 472, 481 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (stating that appellant's incarceration and pattern of criminal and violent conduct make it likely that he will face incarceration again in the future).

J.J. is a toddler who has bonded with his foster family. They can provide a stable home with love and security. They want to adopt him. Jason has not bonded with J.J. Although Jason expressed plans to get a job and find a home once he was released from prison, these plans were nebulous and changed from the first day of the proceeding (when Jason testified he would work with the Austins doing construction) to the second day of the proceeding (when Jason testified that he would work as a pipefitter with a person whom he had met while incarcerated or at a plant where he alleged he had worked before). He simply had no definite plans for caring for J.J. upon his release. *See id.*

After reviewing this evidence, we conclude that the trial court's decision to terminate Jason's parental rights is in J.J.'s best interest. This determination is supported by clear and convincing evidence that is both legally and factually sufficient. We overrule Jason's sixth issue.

## CONCLUSION

Having concluded that Jason's appeal is not frivolous, we sustain his first issue. However, we have determined that legally and factually sufficient evidence support termination of Jason's parental rights due to his conviction and sentence to more than two years' confinement since the filing of the termination proceeding. Further, there is

11

legally and factually sufficient evidence to support the trial court's determination that termination of Jason's parental rights is in the best interest of J.J. We therefore affirm the trial court's judgment terminating Jason's parental rights.


/s/      Adele Hedges
         Chief Justice


Panel consists of Chief Justice Hedges and Justices Jamison and McCally.