

# NUMBER 13-13-00477-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF C.U.M.H., A CHILD

**On appeal from the County Court at Law No. 1
of Calhoun County, Texas.**

## MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Perkes
Memorandum Opinion by Justice Perkes**

Following a bench trial, the trial court terminated A.V. ("Mother") and J.A.'s ("Father") parental rights to their minor child, C.U.M.H. ("Charles").[1]  By one issue, Mother argues the evidence is legally and factually insufficient to support the finding that termination of her parental rights is in Charles's best interest.  By one issue, Father argues that termination of his parental rights for failure to comply with court-ordered services violates the equal-protection clause of the Fourteenth Amendment to the United

---

[1] In parental-rights-termination appeals, we use aliases to protect the minor's identity.  *See* Tex. R. App. P. 9.8; *see also* Tex. Fam. Code Ann. § 109.002(d) (West 2008).  In this context, "an alias means one or more of a person's initials or a fictitious name, used to refer to the person."  Tex. R. App. P. 9.8(a).

States Constitution. *See* U.S. CONST. amend. XIV. According to Father, he lacked the financial means necessary to comply with service-plan requirements, such as driving to scheduled visits with Charles and completing an anger-management course. We affirm.

## I. FACTUAL AND BACKGROUND

### A. Mother and Father's Four Children

Mother and Father had at least four children together. In August 2011, their eighteen-month-old son, C.H. ("Calvin"), was found dead in his crib. At the time of his death, Calvin had an empty stomach, a sunburn, and hard, dry stool in his bowels. Calvin had lost at least six pounds in the month preceding his death. The Department of Family and Protective Services (the "Department") concluded there was reason to believe Mother and Father's physical neglect of Calvin caused his death. On account of Calvin's death, the Department removed a younger son, C.H. ("Damien"), from Mother and Father's home in August 2011.

On August 17, 2012, Charles was born. The Department removed Charles from Mother and Father at birth, before Mother and Father could take him home from the hospital. The reason for removal was risk of physical neglect in light of Calvin's death. On August 20, 2012, the Department filed its petition for conservatorship and termination of parental rights. The Department created service plans for Mother and Father which the trial court adopted. Among other requirements, the service plans required Mother and Father to complete counseling and an anger-management course.

Between the initiation of this suit and the time of trial, Mother and Father moved to Atascosa County, Texas, and had another baby, A.H. ("Ann"). The Department removed Ann from Mother and Father at birth.

2

On August 22, 2013, the trial court held a bench trial on the termination of Mother's and Father's parental rights to Charles. The trial court thereafter entered judgment terminating their parental rights.[2] This appeal ensued.

## B. The Evidence Adduced at the Termination Trial

### 1. Counselor Wendy Holder's Testimony

Wendy Holder is a licensed professional counselor. She provided individual counseling services to Mother and Father starting in December 2011.[3] Holder testified that Michelle Moran, Ph.D. diagnosed Father with schizophrenia and Mother with bipolar disorder in 2011 (after Calvin's death and Damien's removal from the home). Holder testified about her counseling relationship with Mother and Father. Holder concluded that Mother living with Father poses a danger to Charles. Holder explained that their mental illnesses make it unsafe for Charles to live with Mother and Father because there would not be an adult with sufficient mental health present to care for Charles.

Holder provided weekly counseling services to Mother and Father until their parental rights to Damien were terminated, after which their participation in counseling became inconsistent. Holder testified that Mother and Father scheduled fifteen sessions and missed seven in 2013 and that they were required to attend thirty-two sessions between January 2013—after their parental rights to Damien were terminated—to June 2013 when they decided to stop attending altogether.

---

[2] In December 2012, the parental rights to Damien were terminated. Termination proceedings regarding Ann are currently pending in Atascosa County. No issue in this appeal pertains to Damien or Ann.

[3] Holder testified that, once or twice, she may have provided joint counseling services to Mother and Father, but she primarily counseled Mother and Father separately.

Holder testified that during counseling, Father told her that he suffers from schizophrenia, post-traumatic stress disorder, hallucinations, and that he has multiple personalities. Holder related that during the counseling sessions, she met some of Father's "five different personalities," one of which is violent. Holder explained:

> It's been discussed in session, fearfulness of a particular personality being unleashed or getting out. Homicidal tendencies have been addressed in individual counseling sessions, and even [Father] has disclosed a fearfulness of letting—of one of his particular personalities loose, and what might happen if that—that happened.

Holder and Father spoke of his violent behavior in the home. Father stated there were: "Like holes punched in walls, anger outbursts that were uncontrollable, those type of things." Holder acknowledged that this behavior caused her concerns if a child were to be in the home. When asked if Father ever discussed any violent tendencies to people, she testified, "I do remember one incident that he had mentioned that he had followed some people with the thoughts of harm, and he was able to catch himself and make himself go home and knew that that was something that needed to be addressed and talked about."

Holder testified further that Father's schizophrenia includes hallucinations and mood swings, from having manic episodes to having depressive episodes. Holder explained these symptoms make it difficult for Father to maintain employment and to maintain a home. When asked why she was of the opinion that Father would be unable to care for Charles, Holder replied:

> I have [concerns] about [Father] . . . if he begins to not have as much control over the personalities again and one of them comes out. He doesn't—you know, he has lapses in his memory when those things happen, and he can't tell you what happened sometimes. So, if he's in care of a child during that time, that's very concerning.

4

Holder also expressed concern that Father discontinued his counseling and medications, which might otherwise help him control his mental illness. Holder explained that in counseling, Father had started to make progress in processing Calvin's death. Father admitted to Holder that his difficulty with managing stress contributed to his missing the symptoms that Calvin was sick and needed medical help before his death.

Holder testified that, like Father, Mother might benefit from regular counseling indefinitely, but Mother stopped participating on a regular basis.[4] Holder described that Mother is bipolar and had "a very flat affect in her counseling, [and a] limited range of emotions." Holder explained that Mother "[t]ends to minimize, [and] dismiss things" and is very difficult to "read" because she does not show much emotion. Holder testified that she discussed with Mother the possibility that her parental rights might be terminated and that Mother demonstrated a "very constricted affect. Almost like it was just kind of dismissed and pushed aside." Mother also told Holder that "at times" she was experiencing some depression.

When asked how Mother's flat affect affects Mother's ability to parent Charles, Holder replied:

> She doesn't readily express emotions. She also has a very limited capacity in her personal relationships, except those immediately around her—like she's very close to [Father]. She's very close with her mother. But due to the fact that she has difficulty with interpersonal relationships, and due to the fact that the children have been removed—[Charles] has been removed at birth—I would suspect that there's going to be some difficulty attaching—with some attachment issues with the child, which makes it difficult to parent. Any time there's attachment issues going on, it's going to make it more difficult to bond.

---

[4] Holder was not certain that ongoing counseling would benefit Mother due to Mother's inability to form a personal attachment. Holder testified Mother did not progress in counseling beyond receipt of "service."

Holder testified that, in her professional opinion, Mother's inability to attach is potentially dangerous to Charles. She explained: "If you're not bonded to a child, it makes it more difficult to care for him. We've also, through her counseling, discussed situations that happened with [Calvin, their child who died]." According to Holder, Mother did not "process" Calvin's death in counseling and did not recognize any responsibility for Calvin's death. Mother admitted to Holder that "she lacked some bonding with [Calvin] due to some circumstances that surrounded the situation they were in at the time."[5] Holder also expressed concern over Mother's inability "to maintain a job, inconsistencies with being unable to maintain the household" and her "struggle to take care of herself."

When asked if Mother or Father expressed any "long-term goals for [Charles]," Holder testified that they did not. On cross-examination, Holder confirmed that "[i]t would be a struggle" for Mother and Father to put Charles's needs before their own. When pressed further regarding whether they would be able to do that, Holder replied, "Not consistently, no." Holder was then asked, "Would they be able to do it some of the time?" and she responded, "Not enough of the time to ensure the safety of the child."

### 2. Social Worker Joseph Smullen's Testimony

Joseph Patrick Smullen is a licensed master social worker who is a team leader of "Psychosocial Rehab Services" at Gulf Bend Center, the community mental health center at which Father was a patient. Smullen was Father's psychosocial rehabilitative case manager from November 2012 through late January 2013. Due to the magnitude of his

---

[5] The record suggests Mother, Father, Calvin, and Damien were living with another relative at the time of Calvin's death and that this living arrangement was stressful for Mother and Father.

condition, Father was authorized to receive weekly services from Gulf Bend Center in his own home.

Smullen explained that, "Psychosocial rehab consists of occupational, vocational, educational, and behavioral, and cognitive intervention to address deficits in functioning. Deficits in functioning . . . include independent living, employment, housing, and community integration." Smullen testified that Father's services focused on symptom management for his "schizoaffective disorder." Smullen primarily addressed Father's auditory hallucinations. Father had "five distinct voices that he was hearing," one of which was a violent personality. Though Smullen saw Father for six of his ten appointments with Gulf Bend Center, Smullen testified he saw no improvements in Father's coping skills over the course of therapy.

### 3. Social Worker Shayla Sharon Prince's Testimony

Shayla Sharon Prince also served as a Case Manager for Father when he received services from Gulf Bend Center, and provided psychosocial rehab services to Father. She testified Father told her that he had hallucinations and "[h]e was just hearing different voices, different voices telling him different things." Prince testified that in April 2013, Father said he was no longer experiencing auditory hallucinations. She explained that services to Father stopped because "[h]e no longer wanted the services, and so he was discharged." Prince testified that based on her observations of Father between February and April 2013, Father is not "clean;" he does not regularly bathe and he does not maintain personal hygiene.

### 4. Department Case Worker Denise Marie Meza's Testimony

Denise Marie Meza has been the caseworker since "[t]he end of October" 2012. Meza developed the service plans for Mother and Father. She testified that she had no reason to believe that Mother and Father did not understand what was required of them. Mother and Father were required to participate in counseling with Holder; however, they stopped attending counseling in violation of their respective service plans. Both were unwilling to complete the counseling. Meza testified that neither Mother nor Father obtained stable employment, and that although they were required to obtain and maintain safe and stable housing, they did not. Meza attempted to visit Mother and Father's home once per month, but they were often out when Meza stopped by for a visit.[6] On multiple occasions when Meza did visit Mother and Father in their home [in Calhoun County], the home was in such a state of "disarray" that it would be dangerous for a young child like Charles.

Mother was court-ordered to go to Gulf Bend Center to participate in a psychiatric evaluation. Meza testified she never received any documentation that the evaluation happened. The psychiatric evaluation was ordered to determine whether Mother "needed medication for her mental illness." She related that Mother had worked at Wal-Mart for a "couple of months," but otherwise did not work.

Meza testified that Mother and Father had the opportunity to visit Charles during the pendency of this case, but that Mother and Father missed some of the scheduled visits. She described Mother's interactions with Charles during visits as "detached."

---

[6] Meza testified she was unsuccessful in her attempt to visit Mother and Father in their new home in Pleasanton, Texas, which is in Atascosa County.

Meza elaborated, "She would just hold him. She wouldn't interact with him anymore. He was a baby, but no baby talk or anything like that. I would say it was very detached." She also testified that the interaction between Mother and the child "just seemed very cold." According to Meza, Mother had to be prompted to burp and feed Charles during visits because Mother did not recognize that Charles had these physical needs. Meza "did not see any progress between the child and [Mother]" during the visits.

Meza testified that there are concerns with Mother's ability to parent Charles based on the lack of her attachment with him. Based on her observations, Meza questioned whether Mother would be "able to meet his physical and emotional needs." Meza testified that Mother's lack of attachment is a safety concern because "[i]t would affect her ability to protect the child." She elaborated that there were concerns about Mother's ability to keep Charles "clean and safe from the risk of harm in their home."

As to Father, Meza testified that while he began to play and interact with Charles during supervised visits, "[h]is mental illness" and the associated potential for violence were of concern to the Department. The Department was also concerned about Father's decision to no longer seek services from Gulf Bend Center. During the pendency of the termination case, Father only worked for approximately one month.

Meza concluded that Mother and Father had not demonstrated to the Department an ability to provide Charles a safe and stable home because they did not make "any progress" with the service plan, did not establish stable and safe housing, and did not obtain stable employment.

9

### 5.      Father's Testimony

Father testified that he is schizophrenic and that he has been diagnosed with schizoaffective and multiple personality disorders. He acknowledged that he had hallucinations about six months before trial. Father testified that he no longer uses medication to manage his mental illness. Instead, he is using a meditation technique his father taught him.

Father testified that he remembers having five personalities. He acknowledged that one of his personalities was violent and explained: "It was possessive. It was most of the time angry. It was consumed by vengeance." According to Father, one to two years prior to trial, he was "homicidal." Father has had homicidal ideations and just wanted to hurt "random people" before he focused his desire to hurt on his grandfather.

Father admitted that prior to the death of his child, Calvin, he "actually" had "a lot" of hallucinations. The hallucinations occurred "every two days." Father acknowledged his role in Calvin's death because he ignored the child's symptoms:

> I wrote off the fact that he was vomiting. I wrote off the fact that he was often crying. He was hungry, but every time we would try to feed him, he wouldn't eat. I didn't take him to the doctor because I was just focused—completely on trying to get [Mother and Calvin] and [Damien] out of that house, alone with myself.

Father testified that he was receiving the medication Risperdal at Gulf Bend Center. He admitted, however, that he had not taken the medication since his last contact with Gulf Bend in April 2013. In admitting that he ended the services he was receiving from Gulf Bend, Father explained his rationale for no longer needing those services as: "It's more, you know, if I can handle it myself, then why waste their time."

10

Father testified that he does not think the medication is necessary to control his mental illness. He did not consult with a psychologist or psychiatrist prior to his stopping the medication and at the time of trial he was not under the care of any mental-health professional. At trial, Father was asked, "You just took it upon yourself to take yourself off meds?" Father replied, "After I figured—after I remembered the meditation method, yes." Father described the meditation technique as taking fifteen minutes or even an hour alone in a quiet environment. Father felt he could use this technique even while living in a one-bedroom apartment with a one-year-old child like Charles. Father testified that if Charles returned to live with him, his meditation or "calming" place would be the bathroom.

When asked at trial if he believed that his mental illness has had any effect on his ability to take care of Charles on a daily basis, Father replied, "No." But then, Father testified that he "need[s] more work [regarding his] patience when I'm burping" "[a]nd recognizing changing [Charles's diaper] and stuff like that." He also conceded that he needs to continue counseling services; however, he has failed to see a counselor since he last saw Holder. Father testified he could not get gas money to attend counseling, though he was driving for visitation appointments with Charles. According to Father, due to scheduling conflicts, it was impossible to combine visitation and counseling trips.

When asked about their moving from the Port Lavaca, Texas area, Father testified that he moved to Corpus Christi, Texas "at first." He testified that he moved "to get a job" but it "fell through" so after "[j]ust a week," he "moved to Pleasanton with [Mother]." He testified that Mother moved in with her mother in Pleasanton and then he

joined them. Father admitted he knew Mother's mother had physically abused her in the past; however, he was of the opinion that her house was safe and appropriate.

Mother and Father stayed in that house for "[a]bout a month." According to Father's testimony, they moved out on July 23, 2013 and relocated to their "current address" on North Commerce Street in Pleasanton. Father testified Mother's mother would be their first back-up support system in caring for Charles.

### 6. Mother's Testimony

Mother testified that she was last employed in May 2013 and that she worked for Wal-Mart for "a year and two months." Mother acknowledged that she was court-ordered to comply with the Department-created service plan, but admitted she did not "fulfill" her counseling requirement. She explained that she did not trust the counselor, Holder, particularly after Holder testified against her in the termination case involving Damien. Mother testified Holder was trying to persuade her to give Charles to the foster family.

Mother denied having ever been diagnosed as bipolar. Mother testified that in 2010, Gulf Bend Center said she was not bipolar. However, Mother testified she is depressed due to her loss of Calvin, Damien, and Ann. She explained that in the same time period, an uncle and two friends died. She blamed Calvin's loss of six pounds before his death on her father taking their food.

In discussing the physical abuse her mother inflicted on her, Mother testified that her mother "did hurt us, but she was young. She was young at that time, and she didn't necessarily technically know what she was doing; and she did say that she was sorry for her actions toward me, actually doing anything physically violent towards me after it was

12

done."  When asked if she was aware that the Department's investigations of her mother resulted in "reason to believe" findings for her physical abuse of Mother, Mother replied: "No.  Because nothing has actually ever proved that she physically hurt me or caused me any type of abuse."  But then Mother was asked, "Did your mother ever physically hurt you?" She responded, "Twice" and continued, "She had slapped me twice" but "that it was more or less like an accident."

Mother testified that she trusts her mother to watch Charles because, "She's always done great with kids."  When asked, "Although she hurt you?"  Mother replied:

> It was only when I was—that one instant was only because I had wound up ruining an actual picture.   I didn't know what I was doing at this time.   I was just scribbling on something.   I didn't know it was important, and my mom reacted violently, but she did say that she was sorry for it.

Although not admitting that she deserved to be hurt, Mother explained that "all parents have that one instance where they do something that is negative" and that "[w]ithout knowing that they are" every parent physically hurts their child.

Mother testified that she believes Father has his mental illness under control.   She explained, "And when he does have any type of concern where it actually might be coming back, me and him [sic] to talk; and also, he tends to come to me with any type of dreams that may have meanings or any such things like that."   She testified that Father's meditation and their "talking it out" is sufficient to control Father's mental health issues.  Like Father, she is not of the opinion that one-year-old Charles would cause additional stress for Father's mental illness.  She testified that Father has learned to block and control his hallucinations and that, in the past, she sometimes would try to stress Father and then work with him to fix his mental health.

### 7. CPS Caseworker Marie Spenrath's Testimony

Marie Spenrath is a caseworker for Child Protective Services ("CPS"), assigned to the case in Atascosa County involving baby Ann. She testified that in their current apartment in Pleasanton, Mother and Father have no furniture in the living room. Due to the presence of a dog, Spenrath did not attempt to enter other areas of the apartment. However, she testified that she saw nothing in the apartment she would associate with the care of a young child. Spenrath testified that she would not feel comfortable allowing any child in CPS custody to live in the home. She also testified that she has observed Mother to have normal emotions and that Mother was upset about Ann's removal at birth.

### 8. Guardian Ad Litem Jim Shephard's Testimony

Jim Shephard is a volunteer Court Appointed Special Advocate ("CASA"). He served as a guardian ad litem for Charles in this case. Shephard testified Mother and Father have an inability to differentiate reality from fantasy. Shephard visited their [Calhoun County] home on multiple occasions and described it as a "disaster" that would be unsafe for a small child. Shephard observed litter covering the hall and front room of the home and "stuff thrown all around."

Shephard testified he observed approximately five of Mother and Father's supervised visits with Charles. His most recent observation was on June 1, 2013. According to Shephard, Father showed real concern for Charles and interacted well with him, while Mother's role was less prominent. However, Shephard testified that he did not see Mother and Father exhibit empathy toward Charles the way parents normally do. Shephard also noticed that, at the end of the visits, Father was nonchalant and neither

14

Mother nor Father appeared sad to part with Charles. For his part, Charles was not sad to end his visits with Mother and Father.

## C.    The Trial Court's Ruling

The trial court found termination of Mother's and Father's respective parental rights was in Charles's best interest, *see* TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2011), and terminated their rights under Texas Family Code sections 161.001(1)(M) and (O).[7] Mother only appeals the trial court's best-interest finding. Father only appeals the trial court's finding pursuant to subsection 161.001(O) that he failed to comply with court-ordered services for the return of Charles to him. *See id.* § 161.001(1)(O).

## II.  MOTHER'S PARENTAL RIGHTS

By her sole issue, Mother argues the evidence is legally and factually insufficient to support the finding that termination is in Charles's best interest. We disagree.

---

[7]    Subsection 161.001(1)(M) allows a court to terminate the parent-child relationship if it finds by clear-and-convincing evidence that the parent has had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state[.] *See* TEX. FAM. CODE ANN. § 161.001(M) (West Supp. 2011). Paragraphs (D) and (E), respectively, allow a court to terminate a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," *id.* § 161.001(1)(D), or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(1)(D).

Subsection 161.001(1)(O) allows a court to terminate the parent-child relationship if it finds by clear-and-convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.* § 161.001(1)(O).

15

## A.    Standard of Review

Involuntary termination of parental rights involves natural and constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent.   *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see also In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.).   To terminate parental rights, a trial court must find by clear and convincing evidence that the parent committed an act prohibited by section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child.    TEX. FAM. CODE ANN. § 161.001(1)–(2); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

"Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."   TEX. FAM. CODE ANN. § 101.007 (West 2008); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).   Evidence proving one of the prohibited acts or omissions under section 161.001(1) may also be probative to the best-interest determination.   *In re C.H.*, 89 S.W.3d at 28.   A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of evidence. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.); *see In re S.H.A.*, 728 S.W.2d 73, 86–87 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *see also In re A.M.*, No. 13-12-00767-CV, 2013 WL 1932903, at *25 (Tex. App.—Corpus Christi May 9, 2013, no pet.) (mem. op.).

In reviewing the legal sufficiency of the evidence supporting termination of parental rights, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction

16

that its finding was true." *In re J.L.*, 163 S.W.3d at 85. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could have done so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.* However, we must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact finder's findings and not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(2); *In re C.H.*, 89 S.W.3d at 26. The evidence is factually insufficient if the disputed evidence that a reasonable fact finder would not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding. *In re H.R.M.*, 209 S.W.3d at 108.

## B.    Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b) (West 2008); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). When determining if termination is in the child's best interest, the following list of factors should be considered:

(A) the desires of the child;

(B) the emotional and physical needs of the child now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

17

(E) the programs available to assist these individuals to promote the best interest of the child;

(F) the plans for the child by these individuals or by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. In some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *Id.*

When the Department is the petitioner, section 263.307(b) of the Texas Family Code lists thirteen factors that the court should consider in determining whether a parent is "willing and able to provide the child with a safe environment." *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2008). We give consideration to these factors to the extent applicable. *See In re R.R.*, 209 S.W.3d at 116; *In re J.J.C.*, 302 S.W.3d 436, 447–48 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also In re R.S.*, No. 13-09-00368-CV, 2010 WL 877567, at *2 (Tex. App.—Corpus Christi Mar. 10, 2010, no pet.) (mem. op.).

18

C.    **Analysis**

1.    **Charles's Desires**

Charles was only one-year-old at the time of trial.   However, his guardian ad litem, Jim Shephard, testified Charles was happy, healthy, and doing well in his current foster placement.   Shephard also testified that Charles was not sad to part from Mother at the end of visits.   This factor weighs in favor of termination.

2.    **Charles's present and future physical and emotional needs; present and future emotional and physical danger to Charles.**

Multiple witnesses described at trial how Mother posed a risk of physical and emotional danger to Charles.   The testimony showed Mother is unable to meet Charles's present and future physical and emotional needs.

Counselor Wendy Holder described how Mother's mental illness rendered Mother unable to meet Charles's emotional needs and to keep Charles physically safe.   *See* Tex. Fam. Code Ann. § 263.307(b)(6) (West Supp. 2011) (providing that parent's psychiatric or psychological health is a factor regarding whether the parent can provide a safe environment).   Holder described how Mother's inability to bond with Charles, whom she had not lived with, would make it difficult for her to care for him.   Holder was uncertain Mother would improve even with ongoing counseling because of her inability to bond with others.   Holder also described that Mother's inability to maintain a job and home, and her struggle to care for herself would contribute to her inability to prioritize Charles's needs over hers as to keep him safe.   Holder also explained that Mother living with Father poses a danger to Charles; there would not be an adult with sufficient mental health present in the home to ensure Charles's safety.

19

Department Case Worker Meza described Mother as detached from Charles. Meza testified that Mother's lack of attachment to Charles would make it difficult for her to protect him from harm. Meza believed Mother could not maintain a safe home for Charles.

The guardian ad litem Jim Shephard described Mother as lacking in empathy toward Charles. According to Shepherd, Mother was not sad at the end of her visits with Charles. Shephard described her home as a "disaster" and safety hazard to a young child like Charles.

In summary, when considering Charles's interests and needs and Mother's circumstances, the trial court could reasonably have formed a firm conviction or belief that Mother was not positioned to nurture Charles's present and future psychological and physical needs. These factors weigh in favor of termination.

### 3. Mother's parental abilities; TEX. FAM. CODE ANN. § 263.307(b)(11)–(12) (safe-environment factors for parenting ability and parent's willingness and ability to effect positive environmental and personal changes)

Mother admitted she had difficulty bonding with Calvin, the toddler who died while in her care. The Department presented evidence that Mother's neglect of Calvin was a cause of his death. The Department also presented evidence that Mother would likely be unable to bond appropriately with Charles and sufficiently put his needs ahead of her own to keep him safe. Mother does not challenge the trial court's conclusion under Family Code subsection 161.001(1)(M), that she had a previous parent-child relationship terminated based on conduct in violation of paragraphs (D) or (E). *See Id.* § 161.001(1)(M). These facts weigh in favor of termination.

### 4. Available programs to assist Mother in promoting Charles's best interest

Mother's participation in court-ordered counseling was inconsistent and did not progress beyond a "service" level. For example, Mother did not reach the point of "processing" Calvin's death. Holder doubted ongoing counseling would help Mother with her mental illness. Mother admitted that she did not comply with other service-plan requirements, such as maintaining stable employment. This factor weighs in favor of termination.

### 5. Mother's and the Department's plans for Charles; stability of the home; TEX. FAM. CODE ANN. § 263.307(b)(11)–(12)

"The need for permanence is a paramount consideration for the child's present and future emotional and physical needs . . . The goal of establishing a stable, permanent home for a child is a compelling government interest." *In re A.L.*, 389 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see In re T.D.C.*, 91 S.W.3d 865, 880 (Tex. App.—Fort Worth 2002, pet. denied). Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a).

According to Holder, Mother expressed no long-term goals for Charles. By the time of trial, Mother had not established a stable home for Charles—her home had no childcare items, and she still lived with Father.

The Department recommended that Charles be adopted by non-relatives. According to the Department, Charles and his brother Damien have a healthy relationship and may be adopted by a single family. The Department is in a position to achieve its goals for Charles. Moreover, Mother's mental-health challenges, unemployment, and

21

relationship with Father indicate continuing instability in her home. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (holding fact finder can measure a parent's future conduct by past conduct); *In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied) (same); *see also In re V.A.*, No. 13-06-00237-CV, 2007 WL 293023, at *6 (Tex. App.—Corpus Christi Feb. 1, 2007, no pet.) (mem. op.) (same). These factors weigh in favor of termination.

**6.    Mother's acts or omissions indicating that the existing parent-child relationship is not a proper one; TEX. FAM. CODE ANN. § 263.307(b)(11)–(12).**

There was evidence that Mother's neglect of Calvin contributed to his death. The record shows that he lost a considerable amount of weight in the month before his death. Despite signs he needed medical attention, Mother did not take him to a doctor. Department caseworker Meza testified that Mother had to be prompted to burp and feed Charles during supervised visits. Without external prompting, neither Mother nor Father would burp or feed Charles at the appropriate time.

Since Calvin's death, Mother has failed to obtain stable employment, continues to live with Father who is mentally ill and a potential danger to Charles, and failed to establish a suitable home for Charles. At the time of trial, testimony and photographs demonstrated that her home contained nothing appropriate for a one-year-old child. Mother also missed multiple counseling sessions and visits with Charles that were components of the court-ordered service plan in this case. This factor weighs in favor of termination.

**7.      Excuses for Mother's acts or omissions**

Mother testified she did not trust her counselor, Holder, because she testified in favor of terminating Mother's rights to Damien.   Otherwise, Mother offered no excuses for her acts or omissions.   This factor weighs in favor of termination.

**D.      Summary**

Considering the *Holley* and relevant statutory factors, we conclude the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights is in Charles's best interest.   We overrule Mother's sole issue on appeal.

### III.   FATHER'S PARENTAL RIGHTS

By his sole appellate issue, Father argues termination of his parental rights violates the equal-protection guarantee of the Fourteenth Amendment to the United States Constitution.   *See* U.S. CONST. amend. XIV, § 1.   Specifically, Father argues that because he is indigent, he could not afford the court-ordered anger-management course, nor could he afford gasoline to drive from his residence in Atascosa County to Victoria, Texas for court-ordered counseling and other requirements.   This complaint challenges the trial court's finding under Family Code subsection 161.001(1)(O).   *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

Father did not raise this complaint in the trial court, and thus, it has not been preserved for our review.   *See* TEX. R. APP. P. 33.1(a); *In re B.L.D.*, 113 S.W.3d 340, 349–351 (Tex. 2003) (holding error-preservation rules apply to complaint that jury-charge error in a parental-rights termination case violated due-process clause of the Fourteenth Amendment to the U.S. Constitution).   We note that even if the claimed error had been

23

preserved, it would not change the outcome of this case because Father has not challenged the trial court's predicate finding under subsection 161.001(1)(M) or the trial court's conclusion that termination of his parental rights was in Charles's best interest.[8] *See* TEX. FAM. CODE ANN. § 161.001(1)(M), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination was in the child's best interest."); *see also In re C.R.T.H.*, No. 13-13-0032-CV, 2013 WL 1876515, at *5 (Tex. App.—Corpus Christi May 2, 2013, no pet.) (mem. op.) ("In this case, because the trial court found that termination was in the best interest of the child, any of the three unchallenged predicate findings will support the order of termination."). Father's sole issue on appeal is overruled.

## IV. CONCLUSION

We affirm the trial court's order terminating Mother and Father's respective parental rights to Charles.

GREGORY T. PERKES
Justice

Delivered and filed the
30th day of January, 2014.

---

[8] We note that our holding is consistent with the legal principle that as an appellate court "we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003).