**Affirmed and Memorandum Opinion filed April 8, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-01084-CV

## IN THE INTEREST OF D.Z.R.-M., A CHILD

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-04982J**

## M E M O R A N D U M     O P I N I O N

Appellant C.M. (hereinafter, the "Father") challenges the trial court's termination of his parental rights to his minor child D.Z.R.-M. (hereinafter, the "Child"). The Father asserts the trial evidence is legally and factually insufficient to support the trial court's findings that he engaged in the conduct described in subsections (N), (O), and (Q) of Texas Family Code section 161.001(1) and that termination of his rights is in the Child's best interest. We conclude that the evidence is legally and factually sufficient to support the trial court's finding that the Father engaged in the conduct described in subsection (Q) and that termination of his rights is in the Child's best interest. Accordingly, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

On August 27, 2012, the Department filed suit for protection of the Child. The record reflects that the Child's mother, M.C. (hereinafter "the Mother") had an extensive history with the Department. On October 15, 2010, the Mother pled guilty to injury to a child, and the trial court deferred a finding of guilt, ordering the Mother placed on community supervision for four years. The indictment alleged the Mother injured her daughter, Y.L., by striking, grabbing, and dragging her. Y.L. was placed in the custody of her father, who is not a party to this proceeding. The Department alleged in its petition that it had taken action regarding two other of the Mother's children, E.C. and A.J. The Mother's rights to E.C. had been terminated, and A.J. was not in the Mother's care.

In addition, in 2011, the Department sued seeking protection of another of the Mother's children, T.M, who was born in May, 2011. The Father was determined to be T.M.'s father. On September 12, 2011, the Father was convicted of felony theft, and his sentence was suspended while he served community supervision. On December 12, 2011, the Father's community supervision was revoked, and he was sentenced to three years' in prison.

While the Father was serving this sentence, on September 4, 2012, the parental rights of both the Father and the Mother to T.M. were terminated. While the Mother was found to have committed endangering conduct, and other predicate findings under section 161.001(1) of the Texas Family Code, the Father voluntarily relinquished his parental rights to T.M.

During the termination proceedings regarding T.M., the Department received a report that the Mother had given birth to the Child, the subject of this proceeding, in July 2012. The Department's investigation revealed that the Mother was homeless and had been admitted to a transitional living program.

2

The Father, who was not married to the Mother, was identified as the alleged father of the Child. At the show cause hearing on October 30, 2012, the Department was appointed the child's sole temporary managing conservator. The trial court ordered drug and DNA testing. Family service plans for both parents setting out requirements for reunification with the child were filed with the court. At a status hearing on December 11, 2012, the trial court approved the Father's family service plan and ordered the Father to timely comply with each and every task set out in the plan. The Father's family service plan did not require the Father to perform any tasks. The only task listed was "establish paternity" and the task was assigned to the Department. The record reflects that the Father participated in DNA testing, and his paternity was established. The Father's family service plan bears a handwritten notation that, "If [the Father] is the father of The Child, [the Department] will provide [the Father] with a family plan of service." Our record contains no subsequent family service plan.

On November 5, 2013, the case was tried to the court. The record reflects that the Father was incarcerated at the time of trial, but he was present and participated in the trial. When the case was called for trial, the Father's counsel made an oral motion for continuance. She stated that the Father had been granted parole and that the projected time for him to be released had changed several times. She requested a continuance so that upon the Father's release on parole, he "would have time to complete services." The trial court denied this request.

At the beginning of the trial, a record of the Father's December 12, 2011 criminal conviction for theft of property valued between $20,000 and $100,000 was admitted at trial. The record reflects the Father was sentenced to serve three years in prison. The father's family service plan and the decree from the previous termination case in which the Father voluntarily relinquished his parental rights to

T.M. were also admitted into evidence.

The Department's only witness was its caseworker, Sheena White. The caseworker testified that the Child was then one year old and placed in foster care. She stated that the Child's physical and emotional needs were being met. The Child was the "perfect" age for adoption. She testified she believed termination of the Father's parental rights is in the Child's best interest.

In response to questioning by the attorney ad litem for the child, White testified it would be in the child's best interest for the Father's rights to be terminated because the Father had been incarcerated during the pendency of the case, the Father had not completed his court-ordered services, and the child needs stability. On cross-examination, White acknowledged that she had not provided a copy of the Father's service plan to him because she had difficulty locating him in the prison system. She testified that she had mailed a copy of the Father's service plan to him, but it was returned with a notation that the Father had been transferred to another facility. She obtained a new address from the Father's sister and mailed a copy of the plan to that address, but it was also returned. She contacted the Father's counsel's office and obtained an address, but was later informed by counsel's staff that they were not sure of the Father's location.

The attorney ad litem called the court-appointed child advocate, who testified that she believed the Father's rights should be terminated because of his criminal history and time in jail. Although she had never met the Father, she testified that she did not believe the Father would be able to provide a stable environment "in terms of a home, a job in caring for his son" after his release from jail. The child advocate expressed the opinion that termination would be in the child's best interest. The advocate opined that Child should remain with the foster family and begin adoption preparation with them. She testified it would be best for

the Child to have stability. She noted that the Child's foster parents had cared for other foster children, raised their own children, and had a nice home. She testified the Child was very attached to his foster parents, and they had done a wonderful job with him.

At the conclusion of the child advocate's testimony, the court pointed out that her report stated the current foster parents had "not expressed an interest in adoption at the moment." The child advocate responded that "they have changed their position a couple of times." The advocated explained that were concerned about going forward before the parental rights to the Child had been terminated, and about the delay that might be caused by an appeal. The child advocate also stated that the adoptive parents for two of the Mother's other children were considered for adoption of the Child, but they were "not up for it right now."

The Father testified at trial and stated that he had not received a family service plan, but that he had completed programs and services available to him while incarcerated. He stated, "every program and service that was offered to me in TDC I took and I've completed." The Father testified that through these courses, he learned about work ethic and how to present himself when looking for work. He also participated in a drug education course, although drugs had never been an issue for him. He learned about the negative effects of drugs on the body and brain. The course helped him understand the Mother's circumstances and would help him to be protective of the Child. He testified that he had completed a parenting class in 2010 and learned about placing priority on children's nourishment, safety, and well-being. The Father testified that the Child had twice been brought to visit him while he was incarcerated. He had received six photographs of the Child.

The Father testified that he appeared before the parole board, had been granted parole, and was expected to be released in the beginning of December

2013. In preparation for his release from prison, the Father had contacted his former boss who told him he could return to his previous job. He was also told by his uncle, a regional manager for the Houston Chronicle, that he would be given a paper route to deliver the newspaper. The Father testified that he had his own home, and that, while he has been incarcerated, one of his sisters had been living there and taking care of the home for him. He testified that upon release, he would have a safe and stable home. On cross-examination, the Father admitted that his sister was no longer living in his house and he did not know if his mother was staying there.

The Father testified that he had a plan as to what he would do if he were released from prison and the court did not terminate his parental rights and allowed the Father to be involved with the Child. His plan was to obtain and maintain a job, be involved in the Child's life, and provide time, food, clothing, and safe shelter for the Child. The Father also stated that he planned to be protective of the Child regarding the Mother. He stated that he would care for the Child and that his sister would care for the Child when the Father is at work. He also testified that he had asked several family members to help with the Child's care, and they were willing to provide care.

Finally, the Father testified that it is not in his son's best interest for his rights to be terminated because "a child should be with their family," and he has a safe home and the ability to provide for the Child, including his health and nutrition. He testified that he would provide appropriate discipline, guidance, and supervision for the Child. He also testified that he has two other sons that he has a "perfect" relationship with. Before his incarceration, he provided for them "every single week," visited with them every weekend, and attended all PTA meetings. He testified that if the Child were placed with him or his family members, he would

6

have access to those half-siblings and his other extended family. In conclusion, he pleaded that his rights not be terminated and promised the court that if he were granted custody of the Child, he "will not fail."

The Father's sister L.M. (hereinafter, the Aunt") also testified at trial. She testified that she worked as a senior clerk for Harris County in the Child Support Division. The Aunt stated that she had been involved in the case from the beginning and she had appeared in court for every hearing. The Aunt testified that she was seeking to have the Child placed with her, and she would be willing to adopt him. She testified she is stable, she can provide for all his "basic essentials," and he will be loved and "treated like mine." She did not want to see the Child taken from his family. She expressed her opinion that the Father's parental rights should not be terminated because he is a good father. She testified that he "goes above and beyond for his children," and the Child is part of his family. The Aunt confirmed that the Father had been actively involved with his two older sons prior to his incarceration. She testified that she continued to see these nephews and had them over to her house the weekend before trial.

The Aunt testified that she provides for her three children ages 14, 12, and 11, who are honor roll students. She has talked to her children about the Child, they participated with her in the home study conducted by the Department, and her children are looking forward to their cousin coming to live with them. She testified she was told that she passed the home study. The Aunt testified she has been active in counseling youth at her church and is a "youth president."

The Aunt testified that she is financially able to take care of The Child. She "know[s] how to budget," and has savings. Her children "don't need for anything." The Aunt testified that her mother, a disabled stroke victim, lives with her. The Aunt explained that she is not required to spend much time or funds caring for her

7

mother because her mother receives government support and care. She testified the Father has offered to help provide for the Child if he is placed with her. She testified she has no criminal history or history with the Department. In the Aunt's opinion, it would be in the Child's best interest to be placed with her. She acknowledged that if the Father were required to have supervised visits with the children, she would comply. She stated she did not understand why the Child had not already been placed with her.

On cross-examination, the Aunt acknowledged that there were some concerns raised about placing the Child with her. It had been alleged in the previous termination proceeding that she had helped to hide T.M., the Mother and the Father from authorities. The Aunt denied knowing the parents were "running" while T.M. was missing for a month, although she admitted she was very close to her brother.

The Aunt also testified that the attorney ad litem had never been to her home to review it and had not returned emails or phone calls. The child advocate visited her home once. The caseworker, White, visited her home and updated the home study. White told the Aunt that the home study had been approved. The only reason she had been given for the failure to place the Child with her was the allegation that she knew T.M.'s whereabouts when T.M. was missing.

The Mother testified and addressed the incident when T.M. was missing. She stated that neither she nor the Father told the Aunt where they were until T.M. was about two weeks old. She stated that by that time, she had notified the caseworker of their location. The Mother agreed that her rights to the Child should be terminated, but she stated the Father had always protected his children, and "he has no history the way I do." Although she had denied having a relationship with the Father for almost a year during the case involving T.M., the Mother admitted

that she was later arrested with the Father. She denied that she lied, however. The Mother admitted that she was on probation for injury to a child and was in jail at the time of trial, pending the determination of a motion to revoke her probation.

In rebuttal, the caseworker, White, testified that the Father never telephoned her to check on the Child. She further expressed an opinion that two visits over a year did not constitute significant contact with the child. The caseworker acknowledged that the home study on the Aunt was approved, but she did not believe it would be best for the Child to be placed with the Aunt because she would not be protective as far as the Father was concerned based on the previous incident when the Father and T.M. were missing for a month.

At the conclusion of the trial, the court found by clear and convincing evidence that the Father had engaged in the conduct described in subsections (N), (O), and (Q) of Texas Family Code section 161.001(1) and that termination of the parent-child relationship between the Father and the Child is in the Child's best interest. The trial court signed the final decree for termination and the Father filed a timely notice of appeal.[1]

## II.   STANDARD OF REVIEW

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of 161.001 and that termination is in the best interest of the child under subsection (2). *See* Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re C.H.*, 89 S.W.3d 17, 25–26

---

[1] The Mother's parental rights were also terminated, but she is not a party to this appeal.

9

(Tex. 2002).

The heightened "clear and convincing evidence" burden of proof alters the appellate legal-sufficiency standard of review. *See In re J.F.C.,* 96 S.W.3d 256, 264–66 (Tex. 2002). In conducting such a legal-sufficiency review, a court must look at all the evidence in the light most favorable to the termination findings to determine whether a reasonable trier of fact could have formed a firm belief or conviction that these findings are true. *See id.* at 266. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal-sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its findings if a reasonable factfinder could do so. *Id.* Furthermore, a reviewing court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not mean that a reviewing court must disregard all evidence that does not support the findings in question. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* If, after conducting its legal-sufficiency review of the record evidence, a court determines that a reasonable factfinder could not form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient. *Id.*; *see also In re J.L.*, 163 S.W.3d 79, 84–85 (Tex. 2005) (outlining legal-sufficiency standard of review).

In reviewing a factual-sufficiency challenge to termination findings, we give due consideration to evidence that the factfinder reasonably could have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. The factual-sufficiency inquiry is whether the evidence is such that the factfinder reasonably could form a firm belief or conviction about the truth of the Department's allegations. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could

10

not have resolved that disputed evidence in favor of its finding. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction about the truth of the petitioners' allegations, then the evidence is factually insufficient." *Id*. We give due deference to fact findings, and we do not supplant the factfinder's judgment with our own. *See In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006).

We apply the same legal-sufficiency and factual-sufficiency standards in reviewing the evidence regardless of whether we are reviewing a jury's verdict or, as in this case, the trial court's findings following a bench trial. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

### III.  ISSUES AND ANALYSIS

The trial court's judgment recites that the Father's parental rights were terminated based on predicate findings under subsections (N), (O), and (Q) of Texas Family Code Section 161.001(1). Under these subsections, termination is warranted if the trial court finds by clear and convincing evidence that the parent has

> (N) constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months, and:
>
> (i) the department or authorized agency has made reasonable efforts to return the child to the parent;
>
> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>
> (iii) the parent has demonstrated an inability to provide the child with a safe environment;
>
> (O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain

11

the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;

(Q) knowingly engaged in criminal conduct that has resulted in the parent's:

(i) conviction of an offense; and

(ii) confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition.

Tex. Fam. Code § 161.001(1)(N), (O), & (Q).

The Department was required to prove only one of these grounds to satisfy the first prong of section 161.001. *In re C.M.C.*, 273 S.W.3d 862, 874 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## A.    Is the evidence legally and factually sufficient to support the trial court's finding that the Father engaged in the conduct described in subsection (Q) of section 161.001?

In his third issue, the Father asserts the evidence is legally and factually insufficient to support termination under subsection (Q) of section 161.001(1). Under this subsection, the Department was required to prove by clear and convincing evidence that the Father knowingly engaged in criminal conduct that has resulted in the Father's (1) conviction of an offense, and (2) confinement or imprisonment and inability to care for the Child for not less than two years from the date on which the Department filed the termination petition. *See* Tex. Fam. Code § 161.001(1)(Q); *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003) (construing phrase "two years from the date of filing the petition" to apply prospectively from the date of filing a petition). The evidence contains the judgment reflecting the Father's felony conviction for theft of property valued between $20,000 and $100,000. On appeal, the Father does not argue that the evidence is legally or

factually insufficient to support the trial court's finding that the Father knowingly engaged in criminal conduct that resulted in the Father's conviction of an offense. Rather, the Father argues that the evidence is legally and factually insufficient to support the finding that the Father's criminal conduct resulted in the Father's confinement or imprisonment and inability to care for the Child for not less than two years from the date on which the Department filed the termination petition. For subsection (Q) to apply, the Father must be both incarcerated or confined and unable to care for the Child for at least two years from the date on which the Department filed the termination petition. *See In re H.R.M.* 209 S.W.3d at 109–10.

We first address the sufficiency of the evidence to support the trial court's finding that the Father's criminal conduct would result in the Father's confinement or imprisonment for not less than two years from the date on which the Department filed the termination petition. The Department filed the petition on August 27, 2012; accordingly, two years after filing the petition is August 27, 2014. *See In re A.V.,* 113 S.W.3d at 359–60. According to the judgment reflecting the Father's theft conviction, the Father was sentenced to serve three years' confinement on December 12, 2011. The Father was also given credit for fifteen days previously spent in jail in that case. Thus, this sentence would expire in late 2014, after August 27, 2014. The Father argues, however, that we must consider his testimony that he had already been granted parole and was expected to be released in the beginning of December, 2013. The Father asserts that, based on this uncontroverted testimony, the trial evidence is legally or factually insufficient to support a finding that the Father's criminal conduct would result in the Father's confinement through August 27, 2014.

In addressing the manner in which an appellate court should review a finding that a parent's criminal conduct would result in the parent's confinement or

imprisonment for not less than two years from the date on which the termination petition was filed, the Supreme Court of Texas has provided the following guidance:

> We recognize that a two-year sentence does not automatically meet subsection Q's two-year imprisonment requirement. In some cases, neither the length of the sentence nor the projected release date is dispositive of when the parent will in fact be released from prison. A parent sentenced to more than two years might well be paroled within two years. Thus, evidence of the availability of parole is relevant to determine whether the parent will be released within two years. Mere introduction of parole-related evidence, however, does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years. Parole decisions are inherently speculative, and while all inmates doubtless hope for early release and can take positive steps to improve their odds, the decision rests entirely within the parole board's discretion.

*In re H.R.M.,* 209 S.W.3d at 109–10 (citations omitted). Admittedly, the father in *In re H.R.M.* did not testify that he had been granted parole. Nonetheless, the evidence does not contain any documents reflecting that the Father had been granted parole, and the only witness who testified that the Father had been granted parole was the Father himself. As the sole arbiter of the credibility and demeanor of witnesses, the trial court, acting as factfinder, was free to discredit and disregard the Father's testimony that he had been granted parole and that he was expected to be released in the beginning of December 2013. *See id.* at 109; *In re J.J.*, No. 14-11-00652-CV, 2012 WL 642118, at *6 (Tex. App.—Houston [14th Dist.] Feb. 28, 2012, no pet.) (mem. op.). Under the applicable standards of review, the trial evidence is legally and factually sufficient to support a finding that the Father's criminal conduct would result in the Father's confinement through August 27, 2014. *See In re H.R.M.,* 209 S.W.3d at 109; *In re J.J.*, 2012 WL 642118, at *6.

Termination under subsection (Q) also requires that the Father's criminal conduct would result in the Father's inability to care for the Child for not less than

two years from the date on which the Department filed the termination petition. *See In re H.R.M.*, 209 S.W.3d at 109–10. Once the petitioner has established a parent's knowing criminal conduct would result in his incarceration or confinement for at least this two-year period, the incarcerated or confined parent must produce some evidence showing how he would provide or arrange to provide care for the child during this period of incarceration. *See In re H.R.M.*, No. 14-05-00281-CV, 2007 WL 707553, at *3 (Tex. App.—Houston [14th Dist.] Mar. 8, 2007, no pet.) (mem. op.). If the parent meets this burden, the petitioner has the burden to prove the arrangement would not satisfy the parent's duty to the child. *See id.*

As discussed above, the Department established that the Father's knowing criminal conduct would result in his incarceration or confinement for at least this two-year period. Thus, we must determine whether the Father produced some evidence showing how he would provide or arrange to provide care for the Child during this period of incarceration. *See id.* Though the Father contends that he did, we conclude to the contrary. Neither the Father's testimony, the Aunt's testimony, nor any other evidence addressed how the Father would provide or arrange to provide care for the Child while the Father was incarcerated. Instead, the Father addressed his plans as to what he would do if he were released from prison, the court did not terminate his parental rights, and he was allowed to be involved with the Child. The Father did not address how he would provide or arrange to provide care for the Child if he remained incarcerated, the court did not terminate his parental rights, and he was allowed to be involved with the Child. The Aunt testified as to her plans to provide care and her ability to provide care if the Child were placed with her or if she were able to adopt the Child. But, if the Aunt were providing care in these circumstances, she would be doing so on her own behalf, rather than agreeing to assume the Father's obligation to care for the Child while

15

the Father is incarcerated. *See In re H.R.M.*, 209 S.W.3d at 109–10. We conclude that the Father failed to produce some evidence showing how he would provide or arrange to provide care for the Child during the period of the Father's incarceration through at least August 27, 2014.

In the alternative, presuming for the sake of argument that the evidence regarding the Aunt's caring for the Child and assisting the Father in caring for the Child constitutes some evidence showing how the Father would provide or arrange to provide care for the Child during this period of incarceration, the Department still would have met its burden of proving that the arrangement would not satisfy the parent's duty to the child. Though she disagreed that it was a valid concern, the Aunt testified that concerns had been raised about placing the Child with her, based on allegations that she had helped to hide T.M., the Mother, and the Father from authorities because she allegedly knew T.M.'s whereabouts during a period in which T.M. was missing and was with the Mother and the Father. During the Department's rebuttal case, caseworker White testified she did not believe it would be best for the Child to be placed with the Aunt because she would not be protective as far as the Father was concerned based on the previous incident when the Father and T.M. were missing for a month. Thus, even if the evidence regarding the Aunt's caring for the Child and assisting the Father in caring for the Child constituted some evidence showing how the Father would provide or arrange to provide care for the Child during this period of incarceration, the Department still would have met its burden of proving that the arrangement would not satisfy the parent's duty to the child. *See In re C.C.L.*, No. 07-13-00167-CV, 2013 WL 5614328, at *3–4 (Tex. App.—Amarillo Oct. 11, 2013, no pet.) (mem. op.); *In re E.J.F.*, No. 12-11-00197-CV, 2012 WL 1515171, at *4–5 (Tex. App.—Tyler Apr. 30, 2012, no pet.) (mem. op.).

16

Under the applicable standards of review, we conclude that the trial evidence is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that the Father knowingly engaged in criminal conduct that has resulted in the Father's (1) conviction of an offense, and (2) confinement or imprisonment and inability to care for the Child for not less than two years from the date on which the Department filed the termination petition. *See In re H.R.M.,* 209 S.W.3d at 109; *In re J.J.*, 2012 WL 642118, at \*6; *In re C.C.L.*, 2013 WL 5614328, at \*3–4; *In re E.J.F.*, 2012 WL 1515171, at \*4–5. Accordingly, we overrule the Father's third issue.

**B.      Is the evidence legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between the Father and the Child is in the Child's best interest?**

In his fourth issue, the Father asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship between the Father and the Child is in the Child's best interest.

A strong presumption exists that the best interest of a child is served by keeping the child with its natural parent and the burden is on the Department to rebut that presumption. *See In re S.M.L.*, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet). Factors for consideration in determining the best interest of a child include the following: (1) the desires of the child, (2) the present and future physical and emotional needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the persons seeking custody in promoting the best interest of the child, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or agency seeking custody, (7) the stability of the home or proposed placement, (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate, and (9)

17

any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *Id.* The list of factors is not exhaustive, nor is evidence required on all nine of the factors to support a finding terminating a parent's rights. *Id.* at 372.

For cases in which the Department or another government agency is the petitioner, section 263.307(a) provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code § 263.307(a). A trial court may also consider the following statutory factors and any other relevant information in determining the best interest of a child: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under

18

the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *See* Tex. Fam. Code § 263.307(b); *see also In re J.J.C.*, 302 S.W.3d 436, 447–48 (Tex .App.—Houston [14th Dist.] 2009, pet. denied). With these considerations in mind, we review the evidence.

Because of the Child's young age, there is no direct evidence about the Child's desires or whether the Child is afraid to be around the Father, whom the Child had only seen twice. The child advocate testified, however, that the Child is very attached to the Child's foster family.

The evidence at trial focused on the Father's acts and omissions indicating the existing parent-child relationship is not appropriate. The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *See In re C. H.*, 89 S.W.3d 17, 28 (Tex. 2002).

The record reflects that the Child was removed from the home pursuant to a finding or threat of neglect or abuse. *See In re E.C.R.*, 402 S.W.3d 239, 248–49 (Tex. 2013). The Mother had been convicted of injuring another child, and her rights to the Child's brother, T.M., were terminated based on an endangerment finding. Despite this dangerous conduct, the Father had maintained a relationship with the Mother. The record reflects that the Child was taken into the Department's care when he was less than one month old, and he was one year old at the time of

19

trial. The Father has been incarcerated during the Child's entire life and has had only two visits with him. The Father failed to maintain significant contact with the Child. There was no evidence the Father had bonded with the child. There was no evidence the Father has provided for the Child financially or taken any actions to provide stability for his child. There was evidence indicating that the Father is unable to care for the Child while he is incarcerated.

The trial court, as the factfinder, may have considered the Father's pattern of behavior in evaluating his ability to provide the Child with a safe home after his release. *See In re S.M.L.*, 171 S.W.3d at 479 (observing that incarcerated parent's absence from the child's daily life, inability to support the child, and parent's commission of criminal acts subjecting him to possibility of incarceration can negatively impact the child's emotional well-being and are factors supporting termination). *See also In re C.J.*, No. 14-07-00838-CV, 2008 WL 4447687, at *5 (Tex. App.—Houston [14th Dist.] July 10, 2008, no pet.) (mem. op.) (stating a "parent's past behavior is indicative of the quality of future care that the parent is capable of providing."). While we recognize that a parent's imprisonment will not, standing alone, constitute endangering conduct, the court may consider the effect of the parent's course of conduct on the well-being of a child. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987). In addition to the Father's theft conviction, the Father subsequently violated the terms of his community supervision. The record reflects that the Father failed to pay his fine, court costs, and other required fees, failed to participate in the Harris County Community Supervision & Corrections Department Community Service Restitution Program, and failed to submit to an alcohol and drug evaluation. The trial court may reasonably have considered the Father's failure to comply with these court-ordered requirements in evaluating his future abilities as a parent.

20

We may also consider the Father's past performance as a parent—apart from his criminal history—in evaluating its bearing on his fitness to provide for the Child and the trial court's determination that termination would be in the Child's best interest. *See In re C.H.*, 89 S.W.3d at 28. Shortly before the Child's brother T.M. was born in 2011, the Father committed theft and was placed on community supervision. As noted above, the Father continued to associate with the Mother, even though she had a conviction for injury to a child and her rights to another child were terminated based upon her endangering conduct. While the Child was in the Department's care, the Father violated the terms of his community supervision, jeopardizing his parental relationship. The Father's rights to T.M. were terminated after he signed a voluntary relinquishment, and that termination decree recited a finding that appointment of the Father as conservator of the child would not be in the child's best interest because it would significantly impair the child's physical health or emotional development. The Father testified that he had a "perfect" relationship with two other sons and talked to them on the phone daily, but the factfinder may have disbelieved his testimony. The Aunt also testified that the Father had been a good father to his two older sons. The Aunt acknowledged her close relationship with her brother. The factfinder also may not have credited this testimony, and we may not disturb the court's reasonable credibility determinations.

The child advocate testified about the Child's close relationship with his foster family. She testified that all of the Child's physical and emotional needs are being met in his current placement. The Department's caseworker testified that the family had done a wonderful job with the Child. The foster family has considered adopting the Child. Both the caseworker and the child advocate testified that in their opinions, it is in the child's best interest for the Father's parental rights to be terminated because the Child needs stability.

In sum, the record contains sufficient evidence to support the best interest finding based on the Father's criminal history, incarceration during the Child's life, the prior termination, and the Father's confinement or imprisonment and inability to care for the Child for not less than two years from the date on which the Department filed the termination petition.

Under the applicable standards of review, we conclude that the trial evidence is legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of the parent-child relationship between the Father and the Child is in the Child's best interest. *See P.W. v. Dep't of Family and Protective Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.). Accordingly, we overrule the Father's fourth issue.[2]

## IV.   CONCLUSION

Having found legally and factually sufficient evidence to support the trial court's finding that the Father engaged in the conduct described in subsection (Q) of section 161.001 and that termination of the parent-child relationship between the Father and the Child is in the Child's best interest, we order the trial court's judgment affirmed.

_____
Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Donovan and Brown.

---

[2]Having overruled the Father's third and fourth issues, we need not and do not address the Father's first and second issues, in which he challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that he engaged in the conduct described in subsections (N) and (O) of section 161.001.